# Commonwealth *vs.* Frankie James Garner.

No. 01-P-28.

Hampden. October 3, 2002. - September 19, 2003.

Present: Lenk, Berry, & McHugh, JJ.

*Homicide. Felony-Murder Rule. Joint Enterprise. Firearms. Self-Defense. Practice, Criminal,* Disclosure of Commonwealth's theory of case, Instructions to jury. *Search and Seizure,* Probable cause, Exigent circumstances. *Probable Cause. Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions.

At the trial of an indictment charging murder in the second degree on a theory of felony-murder arising from a shooting in a nightclub, under the circumstances of the case, the felony of joint venture unlawful possession of a firearm was inherently dangerous or reflected a conscious disregard for human life, and therefore could serve as the·predicate for felony-murder in the second degree. [356-358]

At the trial of an indictment charging murder in the second degree on a theory of felony-murder, the judge properly set forth the elements of felony-murder in his instructions to the jury, and there was sufficient evidence to show that the homicide was connected with and incident to the underlying felony (unlawful possession of a firearm) and that the homicide took place at substantially the same time and place, and that the homicide was independent of the unlawful possession and was the natural and probable consequence of the defendant's act. [358-360]

At a murder trial, the Commonwealth's late specification of its theory of proof (felony-murder in the second degree based on joint venture unlawful possession of a firearm) did not unduly surprise or cause prejudice to the defendant, where the Commonwealth did not lock itself into any one theory of proof to the exclusion of the felony-murder theory, and where the Commonwealth did not seek to mislead the defense by subterfuge or a deliberate shifting of its theory of murder. [360-363]

At a murder trial, the judge correctly instructed the jury on murder in the second degree by virtue of a joint venture to perpetrate the felony of unlawful possession of a firearm, as well as self-defense in relation to the theory of proof. [363-364]

The judge at a criminal trial properly denied the defendant's motion to suppress evidence, where probable cause and exigent circumstances justified the police officers' warrantless entry into the apartment in which the defendant was located, and where the subsequent patfrisk of the defendant was lawful. [364-366]

At a criminal trial, the judge properly admitted in evidence statements that the

defendant voluntarily made to police at the police station, where an intervening break sufficiently insulated those statements from a prior comment that the judge had suppressed. [366-367]

INDICTMENTS found and returned in the Superior Court Department on February 25, 1998.

Pretrial motions to suppress evidence were heard by *C. Brian McDonald*, J.; the cases were tried before *Lawrence B. Wernick*, J., and a motion for a new trial was heard by him.

*Robert S. Sinsheimer* (*David Radner* with him) for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

BERRY, J. The defendant was convicted of murder in the second degree under G. L. c. 265, § 1, on a theory of felony-murder, for a killing in a shootout on January 25, 1998, at Roscoe's Banquet Hall (Roscoe's or the club), a popular after-hours dance club in Springfield, which also sported an unlicensed bar open from 1:00 A.M. to 5:00 A.M., after last call in licensed bars in the area. The underlying felony for the murder conviction was based on a joint venture to smuggle an unlawful firearm into the club. See G. L. c. 269, § 10(a).[1]

The principal issues in this appeal concern (1) whether the conditions existed under which the felony of unlawful possession of a firearm was inherently dangerous or reflected a conscious disregard for human life so as to serve as the predicate for felony-murder in the second degree; (2) whether the evidence was sufficient to prove felony-murder in the second degree; (3) whether the Commonwealth prejudiced the defense by deliberately shifting its murder theory of proof from that represented in pretrial hearings, in what the defendant criticizes

---

[1]The defendant was also convicted of the underlying crime of unlawful possession of a firearm under G. L. c. 269, § 10(a), as well as of possession of ammunition without a firearm identification card, G. L. c. 269, § 10(h). In light of our affirmance of the conviction of murder in the second degree, the conviction of unlawful possession of a firearm, which served as the predicate felony for the felony-murder theory, is to be vacated as duplicative. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 275-276 (1998). The trial judge recognized the duplication but purposely left the conviction in place pending the outcome of the appeal on the murder conviction.

as a late-breaking specification at the close of the Commonwealth's case that the prosecution would advance a theory of felony-murder in the second degree based on joint venture unlawful possession of the firearm[2]; (4) whether the jury instructions correctly outlined the interrelationship between joint venture, felony-murder in the second degree, and self-defense; (5) whether pretrial rulings properly declined to suppress ammunition seized from the defendant's person following a warrantless entry into a house; and (6) whether subsequent statements by the defendant were tainted by a prior statement that was suppressed.

Certain of the issues make it necessary to rehearse with some depth of detail the trial evidence and the judge's findings and uncontroverted evidence adduced in evidentiary hearings on the motions to suppress and for a new trial. For the reasons stated herein, we affirm the convictions and the order denying the defendant's new trial motion.

1. *Factual background.* The trial evidence may be summarized thusly. Because there had been prior incidents of guns being brought into the club, doormen stationed outside searched all men for weapons prior to entry. But, in a poorly thought out exception, women seeking entrance were not subject to any weapons search whatsoever. To subvert the search checkpoint, the defendant, on a prior occasion, had enlisted a young girl to act as a cloak and smuggle his gun into the club. Having used this ruse successfully in the past, on the night of the killing, the defendant, with the assistance of others, embarked on a joint venture to replicate the gun smuggling scheme by using another sixteen year old girl as the transporter.

On this night, Candi Barrett was already inside Roscoe's when she was solicited by Troy Clemons, a friend of the defendant, to return outside and bring in a gun that the defendant was holding. Clemons had previously asked another young girl, Sabrina Jenkins, because she had done that for the defendant once before, but Jenkins declined to do so this evening. Barrett went outside with Clemons and met the defendant. The

---

[2]This claim was raised by means of a motion for new trial, which was denied by the judge who presided over the trial. The appeal from that denial was consolidated with the direct appeal from the convictions.

defendant handed her a "big" gun with a brown handle — the same color as the gun that Jenkins had previously smuggled into the club for the defendant. This night, Barrett placed the gun in her jacket and, not being subject to search, freely reentered the club with the hidden gun. (In addition to Barrett's identification of the big gun with the brown handle, fingerprint analysis disclosed the defendant's latent palm print on this revolver.)[3] When back inside, Barrett passed to Clemons the gun that the defendant had given her. Some time thereafter, gunfire erupted in the club. Before the shooting commenced, two of the defendant's other friends, "Chill Will" Brantley and Shundell Gasque, were seen trying to take a neck chain from the victim, Orlando Taylor.

Barrett identified the defendant as the man who shot at Taylor. She saw the defendant, who was standing near one of the doors in the front of the club, take aim and fire across a pool table, behind which Taylor had crouched.

Jenkins also witnessed the shooting and saw the defendant fire a shot in Taylor's direction across the pool table. At trial, Jenkins stated that she had seen Taylor holding a gun but did not see Taylor fire it. As Taylor was moving behind the pool table, Jenkins saw Gary Scott (known as "G Money") hit Taylor over the head with a gun. (G Money had been standing outside with the defendant when the latter handed the gun to Barrett to carry in.) It is not clear whether G Money hit Taylor over the head before the latter could fire the gun he held.[4]

Felicia Miller, the defendant's long-time girlfriend, was also at the club that night, accompanied by her sister April Miller. April saw a man standing near the front door shooting a gun. As the sounds of gunfire reverberated about the club, April felt

---

[3]The ballistics evidence was that the subject gun, a .357 magnum revolver that was found after the shooting in the parking lot of the club, had fired the bullet killing the victim. The six cylinders of the magnum held one discharged .357 magnum casing, four other live .357 magnum rounds, and one live .38 special round. See note 6, *infra*, regarding other guns involved in the shootout.

[4]Whether Taylor fired a shot was a disputed point. Jenkins's grand jury testimony was inconsistent with her trial testimony. At the former proceeding, Jenkins stated that she saw Taylor fire one shot. Her grand jury testimony was introduced as substantive evidence. See *Commonwealth* v. *Daye*, 393 Mass. 55, 71-75 (1984).

a sting in her side. A bullet had hit her, but had been deflected by a lipstick container in her pocket. (As shall be described later, this bullet was retrieved from April when the police — following pursuit of a fleeing suspect — entered a house where, among others, April and the defendant were found.) At trial, April confirmed that the shooter was standing near the front door of the club, but stated that she was unable to identify the man. April also testified that she did not see the defendant with a gun that night.

Such was the scene inside the club. We turn to outside events. At 2:53 A.M., Springfield police Officers Howard Lockwood and Kimberly Brantley were on cruiser patrol near Roscoe's when they heard four or five shots fired and saw muzzle flashes through the front window. The officers quickly alighted, radioed a bulletin of gunfire at the club, and then ran toward the building. As they did so, the officers saw two men moving backwards out of the front door. One man was tall, clad in a black puffy coat and a black knit cap. The officers could see he was holding a silver handgun. See note 6, *infra*. The second man wore a white "barn-style" coat and black jeans. The officers were unable to see whether this man was also holding a gun.

Having identified themselves as police, the officers ordered the two suspects to stop, but the two ran toward the back parking lot, split in different directions, and fled. Officer Lockwood pursued the man in the barn-style coat and black pants. As this suspect rounded the building from the rear parking lot area, Lockwood tried to intercept him by circling to the front of the building. As Lockwood did so, he saw the victim Taylor being helped out the door. Lockwood abandoned the chase and directed his attention to Taylor and the events unfolding there.

Meanwhile, Officer Brantley continued pursuit of the other fleeing suspect in the puffy coat with the silver gun. This man ran through the parking lot, across a street, and behind a house, and then he jumped over a fence, moving onto Chester Street. Springfield police Officers Martin Curley and John Swanson were on cruiser patrol in that area. Having heard the radio bulletins of shots fired and pursuit by an officer of a suspect heading toward Chester Street, Officers Curley and Swanson began

searching on that street, where they discovered fresh footprints in the newly fallen snow. (Brantley had also tracked footsteps in the snow at the point where the suspect had eluded pursuit.) Curley and Swanson followed the footprints to the rear of a duplex at 48 Rifle Street, which was approximately two minutes away from the club. The officers heard commotion inside, including a very loud and excited discussion about a shooting: one woman asked someone if they had been hit and another woman responded, "I don't know." The officers called for backup and additional officers arrived within minutes. The police knocked on the front door; no one answered. The house fell silent. Seconds thereafter, with guns drawn, the police entered through the unlocked front door.

Seven people were collected inside. These included the defendant, three young males, April and Felicia Miller, and their mother. The officers ordered everyone to lie on the floor.[5] The defendant was wearing black jeans (as had one of the fleeing suspects) but was not wearing a coat or a shirt. He was "sweating profusely," "gasping" for air, "panting very heavily" and "very agitated." Springfield police Detective Greg Bigda conducted a patfrisk and found in the defendant's back pocket six live rounds of ammunition — five bullets were .357 magnums and one was a .38 special. (The ballistics evidence was that all of these bullets would fit the cylinders of a .357 magnum model, precisely the model of the brown-handled revolver identified by Barrett, which bore the defendant's palm print and had fired the fatal shot. See note 3, *supra*.)

Further events unfolded at the house. April Miller gave Detective Bigda the spent .38 caliber bullet that had ricocheted off the lipstick holder in her pocket. Within a short time, while the other officers were still in the house, Officer Brantley, who had been pursuing the man with the silver gun in the black puffy coat, arrived. Brantley indicated that the defendant was not the person she had chased. (Officer Lockwood, who had given chase to the man in the black pants, was not present.) After approximately ten minutes and without making an arrest, the police left.

The next morning, the defendant voluntarily came to the

---

[5] A search was conducted for guns. No gun was found.

police station and, following Miranda warnings, gave a written statement and subsequently made oral statements. The gist of the statements was that the defendant was not involved in the shooting inside the club, but rather was standing outside Roscoe's when the shots were fired and that he found the bullets in a plastic bag outside the club. After receiving the statements, the officers arrested the defendant for Taylor's murder.

The main defenses were that, given the hail of bullets and the presence of other shooters, the prosecution had not proved that it was the defendant who fired the fatal bullet that felled Taylor.[6] The other defense was that, if the jury concluded that the defendant was the shooter of the fatal bullet, then he had shot in self-defense and to protect his girlfriend, Felicia Miller. (The defendant's statements at the police station that he was not in the club at the time of the shooting were acknowledged to be lies.)

The judge charged the jury to consider four theories of homicide: murder in the first degree by deliberate premeditation; murder in the second degree under a theory of unlawful killing with malice aforethought; murder in the second degree under a theory of felony-murder, predicated on joint venture unlawful possession of a firearm; and voluntary manslaughter. On a special verdict slip, the jury indicated a finding of guilt on the felony-murder theory.

2. *Unlawful possession of a firearm as the felony-murder predicate.* At the outset, the defendant argues that the felony of unlawful possession of a firearm could not serve as the predicate for felony-murder in the second degree in this case because, even though the defendant may have participated in a joint venture to smuggle a gun into the club, that still was not sufficient to prove that he perpetrated this possessory offense in a manner posing inherent danger or conscious disregard for human life under the felony-murder doctrine. See *Commonwealth v. Claudio*, 418 Mass. 103, 108 (1994). The shooting in the

---

[6]In addition to the .357 magnum revolver, which was the murder weapon, a Smith and Wesson .22 caliber revolver was found inside the club near the spot where Taylor had been shot. This Smith and Wesson revolver held one discharged .22 cartridge casing and five live .22 caliber long rifle cartridges. A third gun, the silver gun held by one of the fleeing suspects, was not recovered.

club, he suggests, was a spontaneous and justified response by the defendant to a gunfight that erupted without the defendant's initiation, and the happenstance that he was unlawfully carrying a firearm and justifiably fired back did not provide the requisite felony-murder predicate. In these respects, the defendant seeks to distinguish *Commonwealth* v. *Ortiz*, 408 Mass. 463, 466-467 (1990), the only case to deal with unlawful firearm possession as a felony-murder predicate. The defendant's distinguishing point is that, in *Ortiz*, the possession of a firearm from the outset was a part of a felonious undertaking to exact revenge upon and shoot a family rival.

We state the general principles relating to the underlying felonies that suffice for invocation of the felony-murder doctrine. As a general matter, there is no black-letter catalogue of predefined felonies deemed on a per se basis to be predicates for invocation of felony-murder in the second degree. See *Commonwealth* v. *Matchett*, 386 Mass. 492, 505 (1982); *Commonwealth* v. *Claudio*, *supra*.[7] Rather than resting upon inscription in a per se classification, the decision whether a particular felony is inherently dangerous or reflects conscious disregard for the risk to human life so as to justify invocation of the felony-murder doctrine rests upon a case-by-case analysis of the nucleus of facts in which that felony is embedded. *Ibid.* A particular felony offense may not be inherently dangerous or reflect conscious disregard for human life when analyzed in one factual context, but the same felony may nonetheless be inherently dangerous or pose a risk to life as the felony unfolds in a different factual context.

Turning to the particular gun-related felony at issue in this case, there is no per se rule, in the *Ortiz* case or elsewhere, that the offense of unlawful possession of a firearm is automatically a proper felony predicate for invocation of the felony-murder doctrine. Indeed, as regards reasonable suspicion to justify an

---

[7]The difference between felony-murder in the first degree and felony-murder in the second degree is that the former involves an underlying felony punishable by life imprisonment, while the latter does not. See, e.g., *Commonwealth* v. *Gaskins*, 419 Mass. 809, 812 (1995). The discussion in the present case is restricted to felony-murder in the second degree because unlawful possession of a firearm carries a maximum sentence of five years in prison. See G. L. c. 269, § 10(*a*).

investigatory stop, mere possession of a firearm, in and of itself, has been considered not to pose "any imminent threat to public safety." *Commonwealth* v. *Alvarado*, 423 Mass. 266, 270-271 (1996). So viewed, the felony of unlawful possession of a firearm will not, by some principle of presumption standing alone, always be a qualifying predicate for felony-murder. See *Commonwealth* v. *Ortiz, supra.* However, in particular circumstances, the unlawful possession of a gun as embedded in the nucleus of operative facts of a particular place, time, or manner may so enhance the risk to surrounding lives as to reach the level of inherent danger or conscious disregard for human life deemed sufficient to constitute a predicate for felony-murder in the second degree. See *ibid.*

That is the case presented here. In the particular factual nucleus that the prosecution proved, the boundary limned in the *Ortiz* analysis, concerning when the felony of unlawfully carrying a firearm may give rise to inherent danger or conscious disregard for human life, was crossed. We reject the defendant's argument that the felony-murder doctrine predicated on unlawful firearm possession must be bypassed because there was no evidence that the defendant planned the shootout. That the defendant might not have planned the gunfight at the crowded club did not lessen the risk of gunplay engendered by his participation in a joint venture to smuggle a loaded .357 magnum revolver inside. To the contrary, it was obvious that guns were a threat in a nightclub crowded with dancers moving about and people drinking alcoholic beverages. There had been shots fired in the club in the past, and the defendant himself had previously smuggled in a gun. Indeed, it was such a threat of guns that had been the catalyst for the institution of the search protocol outside the club. Aware of the security measures to keep forbidden and dangerous guns out of the club, the defendant wilfully engaged in a joint venture to subvert this search protocol and smuggle his loaded .357 magnum revolver into the club, creating a milieu of inherent danger.

3. *Sufficiency of evidence of felony-murder.* The defendant's related challenges to the sufficiency of the evidence on the elements of felony-murder in the second degree are prone to briefer dispatch. The elements of felony-murder, as set forth in the

judge's jury charge, were in accord with the case law in effect at the time of this trial. But see note 8, *infra.* As then formulated, the elements of felony-murder required proof that: "(1) the defendant participated in a felonious enterprise; (2) a homicide occurred in the course of that enterprise; (3) the felony was inherently dangerous to human life or committed with conscious disregard on the part of the defendant for the risk to human life; (4) the death[] must have been the natural and probable consequence of the felony; and (5) the felony must have been independent of the homicide[]." *Commonwealth* v. *Chase*, 42 Mass. App. Ct. 749, 754 n.2 (1997).[8]

To begin, we do not accept the defendant's premise that a required finding of not guilty was in order because the killing did not occur in the course of the felony in that, or so the defendant asserts, the joint venture of unlawful possession was "completely over" and "wholly unrelated." As to this contention, the Commonwealth need only prove that the "the homicide[] [was] connected with and incident to the carrying [of the firearm and that] the carrying and the homicide[] took place at substantially the same time and place." *Commonwealth* v. *Ortiz*, 408 Mass. at 466.

With respect to the defendant's additional challenges concern-

---

[8]The Model Jury Instructions on Homicide have modified these elements to exclude two elements as follows:

> "Language in a number of cases indicates that in certain circumstances proof of felony murder requires proof that a homicide was the natural and probable consequence of the defendant's act . . . . The court has concluded that this language should not be included as a fourth element in felony murder cases. The language appears to be a superfluous addition to the third element of felony murder. . . . Also, the term 'probable consequence' is misleading because in the vast majority of felonies, including armed robbery, the most common form of inherently dangerous felony, no one is killed. Accordingly, death is not a 'probable' outcome, although it is an inherent risk.

> "In addition, the Court has concluded that there is no need to include in the instructions as an element of felony murder the following: — 'The felony must have been independent of the homicide.' . . . In virtually all cases, this is not an issue for the jury; it is an issue of law to be decided by the judge subject, of course, to appellate review."

Model Jury Instructions on Homicide 67-68 n.8 (1999). See *Commonwealth* v. *Rolon*, 438 Mass. 808, 818 n.11 (2003).

ing the two final elements of proof, given the abandonment of those elements in the model homicide instructions (see note 8, *supra*), and given the analysis of the Supreme Judicial Court as to the superfluous nature of the natural and probable consequence element, as well as the court's conclusion that the independence element is not a jury determination, but one of law for the judge, it is difficult to see how the defendant's evidentiary sufficiency claim gains any buoyancy from these two moorings. However, even assuming that the defendant's claims relating to the abandoned elements of proof ought to be addressed, the evidence was more than sufficient to establish the requisite connection to the felony. The defendant's unlawful possession of a firearm was independent of the homicide. See *Commonwealth* v. *Ortiz*, 408 Mass. at 467 (the carrying of the loaded handgun as a joint venturer "was clearly independent of the homicide[] in the sense that it was distinct from the act[] of violence which resulted in the [victim's] death[]"). Here, as in *Ortiz*, the jury could reasonably find that the defendant "committed that crime with conscious disregard for the risk to human life," *ibid.*, and "[t]he same evidence that supported a finding of the defendant's conscious disregard for the risk to human life also warranted a finding that homicide was a natural and probable consequence of the felonious carrying of a firearm." *Ibid.* Accordingly, the defendant's motion for a required finding of not guilty on the charge of felony-murder in the second degree was correctly denied.

4. *Specification of the Commonwealth's theory of proof of murder.* The defendant's new trial motion was premised on an argument that the Commonwealth's late-breaking specification that, in addition to murder in the first degree by deliberate premeditation, the prosecution would also advance a theory of felony-murder in the second degree predicated upon joint venture unlawful possession of a firearm violated the defendant's due process right to notice of the nature and grounds of the charges to be tried and, by unfair surprise, hampered the preparation of the defense. It was not until the close of its case-in-chief that the Commonwealth specified the felony-murder theory. In addition, the defendant presents an estoppel challenge, viz., that the Commonwealth should have been estopped from pursuing joint venture felony-murder in the second degree because, in pretrial proceed-

ings, the Commonwealth had indicated that it would not pursue felony-murder by unlawful possession of a firearm, but would prove murder by other manner and means.

The judge found that no measurable prejudice flowed to the defendant from the Commonwealth's specification of felony-murder at the close of its case because the defense theory of the case was that the defendant did not fire the fatal shot at all or, alternatively, if the jury thought the defendant was the shooter, he still was not guilty of an unlawful killing because he acted in self-defense or defense of another (his girlfriend).

The defendant argues on appeal that the trial judge's analysis ignores the litigation background in which, or so the defendant asserts, the Commonwealth first represented that the prosecution case would rest on a different theory of murder and then purposely shifted grounds concerning its murder theory, and that this deliberate shifting of sands caused prejudice in marshaling his defense.[9]

"The Commonwealth is not required to specify in answer to a request for a bill of particulars the type of murder it intends to prove, nor the theory under which it intends to proceed." *Com-*

---

[9]The Commonwealth argues that this issue is waived. In denying the new trial motion, the judge leaned to this view, and suggested in his memorandum of decision that the issue may have been waived. The waiver reference by the judge finds support in a colloquy held at the close of the Commonwealth's case. In the absence of any available transcripts, at the colloquy, defense counsel expressed a belief that his handwritten notes, composed during the pretrial proceedings, would show that there was some kind of agreement by the Commonwealth not to pursue a felony-murder theory of proof based on the firearm possession and, instead, that the prosecution had represented that the proof would be either murder in the first degree by premeditation or felony-murder with armed robbery as the predicate. Ultimately, defense counsel drew back from the objection advanced on the basis of his notes. However, we are not persuaded that this exchange gave rise to a full and definitive waiver of the issue, for, beyond the colloquy, defense counsel later renewed objection to the Commonwealth's supplemental jury instruction that set forth felony-murder in the second degree based on joint venture unlawful possession of a firearm; the judge expressly stated he would give this felony-murder instruction "even though the defendant has requested that I not do so"; and defense counsel objected again following the judge's instructions in respect to this theory.

Finally, we note that, notwithstanding the suggestion of waiver, the judge expressly stated that — in the event his determination of waiver was not sustainable in the fuller light of the transcripts — he would address, in his memorandum of decision on the new trial motion, the issue of prejudice accruing to the defendant. In ruling on the new trial motion, the trial judge found no such prejudice, a determination entitled to deference.

*monwealth* v. *Shelton,* 37 Mass. App. Ct. 964, 965 (1994). Where, as here, the murder indictment tracks G. L. c. 277, § 79, the indictment is "constitutionally sufficient to charge murder by whatever means it may have been committed." *Commonwealth* v. *Robertson,* 408 Mass. 747, 749 (1990).

Beyond that, our review of the record does not support the proposition that the Commonwealth sought to mislead the defense by subterfuge or deliberate shifting of its theory of murder.[10] Rather than subterfuge, what emerges from the record of the pretrial hearings is that the prosecution's case in these earlier stages remained open and in evidentiary development — not an unpredictable circumstance, given the need to distill what actually transpired in the pandemonium of a shooting in a crowded nightclub with a host of witnesses who had differing vantage points and differing perspectives of what happened, and whose descriptions were diverse and sometimes changing. See note 4, *supra,* as to contrasting trial and grand jury testimony of the witness Jenkins.

Based on the full record of the pretrial proceedings, we conclude that the Commonwealth did not lock itself into any one murder theory of proof to the exclusion of felony-murder in the second degree based on joint venture unlawful possession of a firearm, and we agree with the trial judge's analysis that there

---

[10]The defendant cites to a hearing on the defendant's motion for a bill of particulars, which was held six months before trial. Given the principle recited above, the motion judge (who was not the trial judge) did not order particularization of the Commonwealth's murder theory of proof. Despite that, the defendant relies heavily on the fact that the motion judge asked whether "as a practical matter, [the Commonwealth] see[s] this as a potential felony murder case; in other words, felony apart from the actual act of shooting." The prosecutor in response noted there was "some suggestion" in the evidence that a chain was snatched from the victim — implying that armed robbery might be a potential underlying predicate for felony-murder. However, this generalized reference was not meant to be, and cannot be taken as, a binding specification.

The defendant next points to a hearing held approximately two weeks before trial, wherein the prosecutor referenced deliberate premeditation for murder in the first degree, and indicated that he did not think felony-murder would be at issue. But the prosecutor also indicated that "the felony murder would be a joint venture basis, . . . *if that played out*" (emphasis added). Thus, contrary to the defendant's contention, the issue of joint venture proof of an underlying felony charge had been referenced by the prosecution before trial. Moreover, it was clear that such a joint venture could encompass the gun smuggling and, hence, the unlawful firearm possession, which actually did "play out" at trial.

was no undue surprise or unfair prejudice.[11]

5. *The jury instructions on joint venture and self-defense.* The defendant contends that the jury instructions were confusingly formulated vis-à-vis the joint venture unlawfully to possess a gun, felony-murder, and self-defense.[12] Specifically, he complains that the instructions may have led the jury to believe that self-defense was not a defense to felony-murder or that the prosecution did not have to prove the absence of self-defense beyond a reasonable doubt. Because there was no objection, we review to determine if there was error in the instructions and, if so, whether any such error gave rise to a substantial risk of a miscarriage of justice. The defendant's challenge fails in the first inquiry. Viewing in entirety, we do not perceive error in the instructions. To the contrary, in this complex case, the judge's carefully crafted instructions were a correct statement of murder in the second degree by virtue of a joint venture to perpetrate the felony of unlawful firearm possession, a felony which carries a maximum sentence of less than life imprisonment. Furthermore, the judge fully and correctly instructed on self-defense at several points in the charge,[13,14] including its relation to the theory of proof of joint

---

[11]We note that the defense did not renew a motion for specification of the Commonwealth's murder theory of proof at the commencement of trial.

[12]The defendant, in passing, challenges the trial judge's declination to reduce the verdict to manslaughter. This issue is presented in conclusory form without citation to any authority and it does not fall within the boundaries of appellate advocacy. Accordingly, the claim is deemed waived. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Were we to consider the issue, we would be of the view that the trial judge's refusal was well justified.

[13]First, the judge in the charge commented on the evidence and, to the defendant's benefit, explicitly interjected self-defense into the jury deliberations. The judge instructed that "[t]he evidence in this case does raise the issue of whether this killing was excused as a result of the defendant's act of self-defense or of defense of another." Second, the judge immediately followed the instructions on joint venture felony-murder in the second degree with a preliminary self-defense explanation, which was, in turn, followed by a comprehensive set of self-defense instructions. Third, consistent with his preliminary reference to self-defense, after a brief time to allow the jury to stretch and thereby to foster fresh attention, the judge recommenced the charge and gave a lengthy (spanning eight transcript pages), comprehensive, and correct instruction on self-defense, emphasizing, among other points, that if the jury had a reasonable doubt whether the defendant acted in self-defense, the jury was required to return a verdict of not guilty of any unlawful killing.

[14]The judge gave thoughtful consideration to the issue whether and to what

venture felony-murder in the second degree.[15]

6. *The warrantless entry and patfrisk.* The defendant argues that his motion to suppress evidence of the bullets found in his pocket was improperly denied since the police officers' warrantless entry into 48 Rifle Street was not justified by probable cause and exigent circumstances and, therefore, the ensuing patfrisk which yielded the bullets was constitutionally tainted. We conclude that the entry was justified by probable cause, that there was exigency, and that the subsequent patfrisk was lawful.

extent self-defense applied to the theory of felony-murder in the second degree. He noted that, in cases where self-defense may be inapposite, the very nature of the underlying predicate felony marked the defendant as the initiating and dangerous aggressor, e.g., armed robbery. This is consistent with felony-murder precedent. In a case of felony-murder in the first degree, *Commonwealth* v. *Griffith*, 404 Mass. 256, 264-265 (1989), the court reasoned that "[t]he right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault unless that person withdraws in good faith from the conflict and announces his intention to retire. . . . [T]he right to claim self-defense may be forfeited by one who commits an armed robbery, even if excessive force is used by the intended victim." *Id.*, quoting from *Commonwealth* v. *Maguire*, 375 Mass. 768, 772-773 (1978). We need not in this case further explore the parameters of self-defense vis-à-vis felony-murder in the second degree based on the predicate of unlawful possession of a firearm, because here, both the Commonwealth and the defense agreed self-defense was at issue, both sides submitted self-defense instructions, and the judge was persuaded, based on the evidence, that an instruction was warranted posing that defense. See note 13, *supra.*

[15]Lastly, with respect to the conduct of the trial, we address in summary fashion two evidentiary rulings challenged by the defendant on appeal. First, the defendant challenges the exclusion of what he characterizes as an excited utterance of the witness Jenkins allegedly expressed on the way to the hospital after the victim had been taken there by ambulance. The trial judge correctly excluded the statement as not bearing the hallmarks of reliability necessary for admission. In such determinations, the trial judge ought to be given broad discretion. *Commonwealth* v. *Marshall*, 434 Mass. 358, 363-364 (2001). We see no abuse of that discretion here.

Second, the defendant claims error in what he characterizes as a prosecutorial leading question regarding Barrett's identification of exhibit one as the gun the defendant gave her outside the club. To be sure, the question was pointed, but we see no substantial risk of miscarriage of justice flowing therefrom — the applicable standard, absent objection. Indeed, the lack of objection may very well have been strategic defense election, as the identification of the gun by Barrett had an element advantageous to the defendant. As defense counsel argued in closing, Barrett's identification of the gun bolstered the defense explanation of why the .357 magnum revolver, which could be found to be the murder weapon, bore the defendant's palm print.

With respect to probable cause, the test is whether there were circumstances sufficient to warrant a prudent person in the belief that a suspect had committed or was committing an offense. *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 486 (1977). With respect to exigency for the entry, the burden is on the Commonwealth to show that "it was impracticable for the police to obtain a warrant, and the standards as to exigency are strict." *Commonwealth* v. *Forde*, 367 Mass. 798, 800 (1975). The constitutional inquiry for an exigency-based entry into a dwelling surveys all of the facts known to the law enforcement officers at the time of the entry (a) as related to exigency in apprehending the targeted suspect, which includes whether the crime involves violence, whether the suspect is armed, whether there is strong reason to believe the suspect is within the dwelling and may escape, and whether the elapsed time to obtain a warrant would enhance the danger to the police or to other persons; and (b) as related to exigency in preserving potential evidence, which includes whether there is a risk that delay attendant upon securing a warrant would facilitate the destruction of evidence. See generally *id.* at 807; *Commonwealth* v. *Molina*, 439 Mass. 206, 209-210 (2003).

The composition of the whole of the known facts is set as of the moment in time of the entry, not refracted through the prism of hindsight. *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981). In this case, the compositional scene demonstrated probable cause and was rife with exigency. Officer Brantley had been engaged in hot pursuit of a suspect with a silver handgun, who appeared very likely to have been one of the shooters in a crowded night club. The fleeing suspect jumped a fence and eluded capture. At the point of the suspect's over-the-fence departure, Brantley saw a set of footprints in the fresh snow near the west side of Chester Street. It was to this reported area near the streets intersecting Chester Street that, having heard Brantley's radio broadcast regarding shots fired and pursuit of a fleeing felon, assisting Officers Curley and Swanson proceeded. As the officers were traversing the area, they came upon a trail of freshly made footprints in the newly fallen snow on the east side of Chester Street — a continuing trail consistent with the tracking path Brantley had pursued. These tracks, in turn, led to

the rear of 48 Rifle Street, forging a strong link between the fleeing suspect and the dwelling. Added to that link was that it was just some nine minutes since the shooting when, through a slightly open window, the officers overheard a conversation which bespoke gunfire at the club and suggested that someone inside the dwelling may have been hit in the crossfire. Considering the compositional matrix of these factors, a compelling set of circumstances demonstrated probable cause and the requisite exigency to justify the warrantless entry.

As to the patfrisk, the officers' attention was reasonably drawn to the defendant, who, very late on this cold winter night, was out of breath, "distressed," and sweating profusely (as if he had been just running), from which the officers reasonably concluded that the defendant may have been the fleeing suspect and may have posed a threat. "Constitutional principles do not require the police to approach a person who is reasonably suspected of being armed with a loaded . . . handgun and reasonably believed to have engaged in violent criminal conduct without taking precautions against the use of that weapon against them." *Commonwealth* v. *Willis*, 415 Mass. 814, 821 (1993).

7. *The statements at the police station.* The defendant moved to suppress a written statement and oral statements, which he provided after having voluntarily come to the police station the morning after the shooting. (As noted previously, the defendant was not arrested at the house following the patfrisk.) The statements the defendant proffered at the police station concerning his actions were largely exculpatory, but were used by the Commonwealth at trial as incriminatory evidence of consciousness of guilt by false explanation.

The basis of the defendant's claim to suppression was that his statements at the police station were tainted, and would not have been given, except that "the cat was out of the bag" because of a prior admission, voiced by the defendant at the house the evening before in response to police questioning, that he had been at the club. This prior statement had been

suppressed.[16] See generally *Commonwealth* v. *Mahnke*, 368 Mass. 662, 686-687 (1975), cert. denied, 425 U.S. 959 (1976) (analysis of due process implications of taint where initial statements are determined to be improperly obtained and initial statement let secret "out for good").

The motion judge, in a well-reasoned analysis of fact and law, determined that there had been an intervening break sufficiently great to insulate the statements at the police station from the prior suppressed comment. The judge considered intervening factors such as that the defendant was not detained following the events at the 48 Rifle Street house; the defendant voluntarily agreed the next day to go to the police station because he wanted to "cooperate" in the investigation; the defendant expressed a willingness to be interviewed and to provide statements at the police station; the defendant was not restrained in any way; and the interviews at the station took place some seven hours after the night entry into the house where the earlier suppressed statement had been given. Further, although not in custody, the defendant was provided Miranda warnings prior to offering his purportedly exculpatory statements.[17]

The judgments of conviction of murder in the second degree and unlawful possession of ammunition are affirmed. On the charge of unlawful possession of a firearm, the judgment is vacated, the verdict is set aside, and an order shall enter dismissing the indictment as duplicative.[18] The order denying the motion for a new trial is affirmed.

*So ordered.*

---

[16]The judge suppressed the remark voiced by the defendant at the house because no Miranda warnings had been given, notwithstanding a law enforcement show of authority in a custodial setting, which included, but was not limited to, police orders that the defendant and the other occupants lie on the floor and the patfrisk of the defendant.

[17]The defendant's related claim that the oral statements were subject to suppression because the Miranda warnings were not repeated, but rather were first given prior to the rendering of the written statement, is unavailing. There was only an approximately three-hour interlude before the defendant's second interview, which yielded the oral statements. Absent indications to the contrary, this relatively short passage of time did not erase the efficacy of the Miranda warnings or invalidate the defendant's waiver.

[18]See note 1, *supra.*