Nickerson, Gary A., J.
The defendant, Julian M. Green, is facing an indictment for second degree murder and related charges arising from the shooting death of Jacques Sellers on July 18, 2007, in the General Patton Drive neighborhood of Barnstable. By his motion to suppress Green seeks to bar the admission at trial of his statements to the police on October 31, 2007 and his testimony before the grand jury on November 9, 2007. A hearing was conducted on the motion on February 4th, 5th and April 26th, 2010. Based on all the credible evidence, the court enters the following findings of fact.
FINDINGS OF FACT
Jacques Sellers was fatally wounded on the evening of July 18, 2007 while he was visiting a home in the General Patton Drive neighborhood of Hyannis, a village in the Town of Barnstable. The police investigation revealed that two guns were used in the crime. The state police and local detectives focused on Julian Green and Anthony Russ as the likely shooters.
Before he entered the Barnstable Police interrogation room on the morning of October 31st, Julian Green was no stranger to police techniques. From December of 2002 through February of 2006, Green was the subject of five separate juvenile court matters encompassing ten distinct charges. His adult record was no less active and included drug crimes and assault and battery on a police officer. In August 2007, Green was arrested for a serious stabbing incident outside the Cape Cod Mall. Later in August, Green was arrested for an attempted robbery of a convenience store. He was being held at the Barnstable County Jail pending resolution of these cases as of October 31st.
Barnstable Detective Edmund Scipione interviewed Green in August 2007 as part of the investigation into the stabbing. On that occasion, Scipione administered the Miranda rights to Green as well as an advisory as to the recording of the interview. Scipione reviewed each aspect of Miranda with Green. Green initialed the rights advisory sheet line by line and signed the form twice, once to acknowledge his receipt of his rights and once to waive his rights (Ex. 5). Green proceeded to discuss the stabbing with Scipione. Apart from his record of arrests and convictions and his interview with Scipione, Green was intimately familiar with police methods because he had served as a police informant in certain matters. Hence, he was well known to several of the officers working on the 31st.
Barnstable detectives arranged for Green to be transported by deputy sheriffs from the county jail to the local station house the morning of the 31st. This was done to ensure his safety inasmuch as Russ was also lodged at the Barnstable County Jail awaiting trial on separate charges. Apparently Green was not given advanced warning as to the interview. No one *294 reached out to Green’s lawyer, assigned to represent him on the stabbing charge, to advise counsel of the interview. The stabbing charge was mentioned only in passing on the 31st.
Upon entering the Barnstable Police facility, Green was taken to the detectives’ section on the second floor, to a well-lit, functional interview room. Green wore an orange prison jumpsuit. He remained handcuffed throughout the day. Over the course of the four-plus hour interview, from 10:20 a.m. to 2:50 p.m., Green interacted with State Police Troopers Robert Smith and Daniel Tucker, and Barnstable detectives Brian Guiney and John Murphy; all wore plain clothes with no visible firearms save for Smith, who had a gun holster on his belt. Both Green and the officers were seated throughout the interview.
At the start of the interview, Smith, Guiney and Tucker were in the room with Green. Smith read the Miranda rights to Green using a State Police rights form.[1] Green stated he understood his rights and signed the line acknowledging receipt of his rights. Trooper Smith did not have Green sign the next paragraph on the form, the waiver paragraph. The substance of the waiver paragraph was not discussed with Green. Green did understand his rights and was, at that juncture, willing to proceed with the interview.
At the outset, the interview was recorded by both audio and visual means. Green was told he was being recorded. An audio feed permitted supervising officers to listen to the interview from a second office on the same floor of the station house. The CD of the interview is of excellent quality. The few portions in which Green’s responses are inaudible are the result of Green mumbling with his head hanging down facing the floor. Green’s school records in evidence indicate he had learning issues and that he failed to complete high school. Nonetheless, there are no limitations as to his communication skills apparent from the recorded interview. Green was sober and alert on the 31st.
After agreeing to speak with the officers, Green participated in the interview in halting fashion. The initial questioning revolved around Green’s whereabouts on July 18th. Green provided an alibi, saying he was with his girlfriend Jessica Schwenk. The conversation moved on to whether Green knew various individuals. The police intimated those individuals were fingering Green. The talk then shifted to guns, specifically whether Green knew what a 57 (short for a 357 firearm) was, whereupon Green stated:
Oh, people are crazy. I think I need a lawyer. You know what I’m saying? This is ridiculous. I don’t know where you are trying to go with this conversation. Like, you’re trying to make it seem like—
Smith cut Green off in mid-sentence and changed the topic by asking Green whether he was close to Anthony Russ. Guiney chimed in suggesting Green’s girlfriend Schwenk was at risk as Green’s alibi. At about 10:37 a.m., Guiney pointedly asked Green if he thought the police were making things up, whereupon Green replied, “Hell yeah.”
The conversation progressed for some 20 minutes as Smith, Guiney and Tucker tried to persuade Green to tell the truth. Murphy entered the room to tell Smith he had a phone call waiting. Immediately before Smith and Guiney exited the room at about 10:55 a.m., Green asked to use a telephone. Murphy said, “O.K.,” but Green was not granted access to a telephone for another 30 minutes. We do not know whom he wished to call at that moment. At about 11:00 a.m., Green yet again told Tucker he “had nothing to do with this all.” Tucker said, “Julian, it’s really tough to believe that right now when you don’t answer the questions.” To that, Green said, “I’m not answering any questions because I don’t have to. I got the right to remain silent.” Tucker responded, “No, you absolutely do, Julian.” Thereafter the interview continued.
At about 11:30 a.m., Green asked to telephone his mother in North Carolina. Apparently he was allowed to do so. Upon resuming the interview, Murphy launched into a long plea to Green to reveal the location of the gun, ending with telling Green, “Take the first step; it’s the hardest. It’s the hardest, I know. Take it.” Green responded with, “I don’t want this conversation. I don’t want to talk about this no more.”[2] Murphy used that comment as an opportunity to empathize with Green as to how he, Murphy, wouldn’t want to talk about it either. Moments later, Murphy asked Green if he felt safe at the jail. Green responded, “I feel safe at Barnstable. People, I don’t care, I want to go back to Barnstable, (inaudible). I don’t want to talk about it.”[3] Murphy again empathized, saying “I know you don’t want to talk about it,” and then he asked Green what his mother said. Green replied, “She said tell the truth.”
In the succeeding minutes, Murphy addressed Green at length, ending with, “Can you help me find the gun?” Green declared, “I don’t know nothing. This is ridiculous. I want to go back to my unit. People can bring up my name all they want.” To this point, Green had neither confessed nor uttered any damning admissions. Nonetheless, the interview continued.
At about 12:30 p.m., Green asked to telephone his girlfriend Schwenk. At first, Murphy denied his request. Green said, “I’ll tell you what I do know.” Murphy cautioned Green that he could not speak to Schwenk so as to intimidate her. Green and Murphy then adjourned from the interview room to a nearby conference room. There, Green got his call. In fact, over the course of the next hour and forty-plus minutes, Green spoke with Schwenk by telephone on at least three occasions. The calls reached Schwenk on her way to work. She was a waitress at a local restaurant. It being Halloween, she was going to work in costume as an angel. Due to her own involvement with the law, Schwenk had not been allowed to visit Green at the *295 jail. Murphy indicated Schwenk could see Green that day at the station house. Murphy used this interruption in the interview to speak at length with Green, off the record. This jurist is unable to discern with confidence the extent and content of their off-camera chat.
When the interview resumed on tape at 2:19 p.m., a recitation of Miranda rights was not given anew. Green answered the questions in a forthright manner, giving a detailed confession and implicating Russ as the second shooter. The interview concluded with the police acknowledging that Green would most likely be charged with second degree murder. At the conclusion of the interview, Green visited with Schwenk.
Schwenk arrived in the detective unit in her white angel’s dress.[4] Murphy allowed Schwenk to visit with Green in a room adjoining the interview room. The room had a large glass window permitting Murphy to monitor the visit. The couple hugged, kissed, and talked at length. Thereafter, Schwenk went to her job.
Murphy arranged for Schwenk to have regular visits with Green at the jail.[5] No physical contact was permitted during her visits between the 31st and November 9th. On November 9th Green was transported to the Superior Courthouse in Barnstable for his appearance as a witness before the grand jury investigating the murder. Either before or after his testimony, Green was allowed to visit with Schwenk in a conference room at the courthouse in the presence of a guard. The couple was able to hug, kiss and talk at some length.
Green was not formally charged with the murder on the 31st nor was he charged in the days that followed. In the wake of the interview, Smith and his superior officers conferred. A decision was made either by the superior officers or by an assistant district attorney to not charge Green with the homicide at that time. All were aware that had Green been charged, Green would have been brought to the District Court and would have received an appointed lawyer. The evidence is inconclusive as to whether the decision not to promptly charge Green was made, in part, to avoid his having appointed counsel.[6] The investigation was complicated given the role of the co-defendant Russ and concerns about his criminal associates. Factors other than the appointment of a lawyer for Green may have been involved in the decision to delay formal charges. Neither Green nor Russ was charged with the murder until indictments were returned January 8, 2008.
Green was not represented by counsel when he was brought before the grand jury. After being sworn before the grand jurors, Green identified himself. The assistant district attorney, Brian Glenny, advised Green that his appearance was to discuss the shooting on General Patton Drive. Glenny asked Green if he had been arrested on that matter. Green said no. Glenny asked if there were charges pending against him in that regard. Green replied “I don’t know, sir.” Green recognized that he had not been before any court as to the murder, that he was a suspect in the shooting and that he had confessed to the crime. Glenny next asked Green if he had been advised on the 31st of his right to a lawyer, which Green acknowledged. Glenny then said, “And you chose to give a statement, isn’t that right?” Green responded, “Yes, sir.”
Glenny then paraphrased the Miranda rights, obviously without the benefit of a Miranda rights form or card in hand. Glenny did not tell Green in express terms that he had the right to remain silent; nonetheless Glenny did tell Green he could stop the questioning. Glenny dwelled on Green’s right to consult with a lawyer but neglected to tell Green that if he could not afford a lawyer one would be appointed for him. Green acknowledged his rights as Glenny stated them and agreed with Glenny that he was still willing to come forward and testify.
Glenny asked Green why he was coming forward to testify. In his own words, Green said, “Because I just want to let it out that I didn’t mean, or, intend to kill anybody or any matter.” Glenny pressed Green as to whether he wanted to tell the truth. Green agreed. Thereupon, Green testified in detail as to his actions and the actions of Russ in the shooting. In closing, Green told the grand jurors that he had discussed his grand juiy appearance with the police, with his mother and with Schwenk before arriving at the courthouse.
After November 9th, Murphy cultivated Schwenk as a source of information in the case. Murphy discovered, through listening to Green’s recorded conversations from the jail, that Green was romantically involved with a second woman. Murphy saw to it that this tidbit of information reached Schwenk, whereupon Schwenk ended her relationship with Green. Once their ardor cooled, Schwenk gave Murphy many letters Green had written to her from jail. The letters set forth Green’s confession to the shooting and his after-the-fact justification for confessing to the police and the grand jury. The letters say he confessed to protect Schwenk, the true love of his life, from prosecution arising from the false alibi.
DISCUSSION
At the start of the interview on October 31st, Green was advised of his Miranda rights in proper fashion.[7] The Trooper read the rights from an acceptable state police form. Green’s verbal acknowledgment that he understood his rights was credible, particularly in light of his extensive prior experience with police investigations and his recent direct review of Miranda protocol at the hands of Scipione. The Commonwealth has met its burden of proving compliance with Miranda and a knowing, valid waiver of said rights at the get-go. Commonwealth v. Day, 387 Mass. 915, 921 (1983).
When an interview is properly underway, the police are required to cease questioning only when the suspect clearly and unambiguously requests counsel; *296 U.S. v. Davis, 512 U.S. 452, 459 (1994); Commonwealth v. Judge, 420 Mass. 433, 448-50 (1995); or when the suspect clearly and unambiguously articulates his right to remain silent. Berghuis v. Thompkins, 560 U.S. _, 2010 WL 2160784, *8 (June 1, 2010); Commonwealth v. Robidoux, 450 Mass. 144, 160 (2007); Commonwealth v. Almonte, 444 Mass. 511, 519 (2005). A determination as to the invocation of either right must be made on the totality of the circumstances. This encompasses the circumstances immediately before and after the purported invocation of one’s rights. See Almonte, supra.
When Green said, “I think I need a lawyer,” he clearly and unambiguously requested counsel. Green went on to say, “Like, you’re trying to make it seem like . . .” but he was cut off in mid-thought by Smith changing the focus to whether Green knew Russ. Most likely Green was about to express his concern that the police were saying he murdered Sellers. Green was not musing to himself as to the advisability of having a lawyer; Commonwealth v. Todd, 408 Mass. 724, 726 (1990); nor was he thinking out loud that he might need a lawyer and might want to stop the questioning until he spoke to the lawyer. Commonwealth v. Morganti, 455 Mass. 388, 397-98 (2009).[8] While “I think I need a lawyer” is not as direct as “I want a lawyer,” á la the defendant’s second statement about counsel in Commonwealth v. Dubois, 451 Mass. 20, 25 (2008), it was an acceptable and reasonable way to frame a request for counsel. Commonwealth v. Contos, 435 Mass. 19, 24 (2001).
Even if the words uttered by Green were equivocal, he was not permitted to fully express his thoughts in regards to needing a lawyer by virtue of Smith interrupting him. Neither the officers present in the interview room nor the senior officers listening by audio feed responded to Green’s request for a lawyer. No effort was made to clarify his purportedly equivocal request. See Contos, 435 Mass. at 30. The officers’ failure to promptly honor Green’s request at 10:55 a.m. for a telephone call, while not legally mandated as Green was not under arrest, see Commonwealth v. Novo, 442 Mass. 262, 271 (2004), is further evidence of their intentions toward Green. The rest of the interview was doomed. “Statements obtained following an invocation of the right to counsel are presumed involuntary unless the Commonwealth proves beyond a reasonable doubt that the defendant initiated further communications, exchanges or conversations with the police and thereby voluntarily, knowingly and intelligently waived his right to counsel.” Contos, 435 Mass. at 30.
After Green requested counsel but before he confessed, Green asserted his right to remain silent on four occasions. Within minutes of requesting a telephone call, Green said he was, “not answering any questions because I don’t have to. I got the right to remain silent.” Trooper Tucker agreed with Green but then blithely ignored the right asserted. This court does not credit Tucker’s opinion that Green’s words amounted to only a display by Green that he was aware of his rights.
The words amount to an unequivocal exercise of the right to remain silent. The Commonwealth argues that in context Green continued to talk with Tucker, so he wasn’t exercising his rights. Some support for this proposition can be drawn from the Morganti decision, but the continuation of the Morganti interview was warranted because the defendant “said it would be easier to speak of the charges if he were in a more comfortable room and was provided something to eat,” requests inconsistent with an intent to terminate the interview. Morganti, 455 Mass. at 398. This court looks to the larger context of the entire interview. When Green said he needed a lawyer, Smith changed the subject. When Green said he wasn’t going to answer questions, Tucker agreed and the interview moved on. Later, when Green said he didn’t “want to talk about this no more,” Murphy empathized and pressed forward. Later still, when Green said he wanted to go back to the jail because, “I don’t want to talk about it,” Murphy again expressed sympathy but changed the subject to Green’s mother’s wishes. Finally, when Green said, “I want to go back to my unit,” Murphy toughened his stance by suggesting he would move on to see if Russ wanted to cooperate. Green’s every attempt to exercise his rights was met by a calculated parry. The police conduct, viewed in total, hardly amounts to a scrupulous observance of Green’s rights. Thus the interview on the 31st must be suppressed.
Massachusetts adheres to the rule that a statement made following the violation of a suspect’s Miranda rights is presumed tainted. Commonwealth v. Smith, 412 Mass. 823, 836 (1992). Our courts have rejected the federal rule of Oregon v. Elstad, 470 U.S. 298, 318 (1985), and its progeny. Nonetheless “[i]t has never been the law that once the police fail in their obligations under Miranda all subsequent uncoerced statements by an accused must be excluded. The taint of a Miranda violation is not ineradicable.” Commonwealth v. Larkin, 429 Mass. 426, 436-37 (1999). The admissibility of the subsequent statement hinges on two lines of analysis. First, was there a break in the stream of events sufficient to insulate the subsequent statement from the effect of all that went before. Second, what was the effect of the previous confession on the defendant’s will (the so-called cat-out-of-the-bag inquiry). Smith, 412 Mass. at 830. “The focus and ultimate goal of undertaking either or both lines of analysis is a determination of the voluntariness of the later confession.” Commonwealth v. Prater, 420 Mass. 569, 581 (1985). The question remains as to whether Green’s grand jury testimony is admissible.
In evaluating whether there is a break in the stream of events, the focus “is on external constraints, continuing or new, which may have overborne the *297 defendant’s will. When circumstances no longer coerce the defendant, a break in the stream has occurred.” Smith, 412 Mass. at 830. Relevant factors include the temporal proximity of the two statements, “the presence of intervening circumstances and the purpose and flagrancy of the official misconduct.” Smith, 412 Mass. 830 fn. 8. Temporal proximity weighs in favor of the Commonwealth in the case at hand. Eight days elapsed between the stationhouse interview and the grand jury testimony. Temporal proximity is more often measured in minutes or hours. See e.g. Prater, 420 Mass. at 581 (90 minutes); Commonwealth v. Pileeki, 62 Mass.App.Ct. 505, 509 (1992) (intoxication dissipated in 4 hours); Commonwealth v. Garner, 59 Mass.App.Ct. 350, 367 (2003) (11 hours).
Green spoke with his mother by telephone during the stationhouse interrogation. A talk with mother was, under other circumstances, deemed to be an intervening circumstance in Commonwealth v. Watkins, 375 Mass. 472, 482 (1978). In the present case, Green, after talking with his mother, asserted his right to silence three times, once by expressly saying he did not want to talk further and twice by saying he wanted to return to jail. There is no credible evidence suggesting Green spoke with his mother after leaving the stationhouse but before he entered the grand jury room. Mother Green’s advice did not effect a break in the stream of events.
Prior to confessing on the record, Green spoke with Schwenk three times by telephone. At the conclusion of the interrogation on the 31st, Green was allowed a contact visit with Schwenk. Schwenk visited Green at the jail in the days leading up to November 9th. A second contact visit was granted at the courthouse on the 9th. Green’s contact with Schwenk is a factor to be weighed in this process. See Watkins, 375 Mass. at 482. Also on the scale is the absence of any contact with counsel during the intervening days. In Watkins, contact with counsel was deemed to be positive evidence of a break in the stream of events. Watkins, 375 Mass. at 482.
The persistent conduct of the officers in ignoring Green’s assertions of his rights during the interrogation on the 31st raises the flagrancy of the official conduct. The absence of counsel was the direct result of the decision not to charge Green following his confession on the 31st. A “knowing exploitation by the State of an opportunity to confront the accused without counsel being present” violates Sixth Amendment guaranties of assistance of counsel. “The Sixth Amendment thus imposes on law enforcement an ‘obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.’ ” Commonwealth v. Hilton, 443 Mass. 597, 614 (2005), quoting Maine v. Moulton, 474 U.S. 159 (1985). The evidence at hand is inconclusive as to whether the decision to delay charges was premised, in whole or in part, on a desire to block Green’s access to counsel. Inasmuch as the burden of proving attenuation rests with the Commonwealth; Smith, 412 Mass. at 837; Pileeki, 62 Mass.App.Ct. at 508; the lack of clarity on this issue does not bode well for the Commonwealth.
The proceedings within the grand jury room are significant. Green arrived already in custody. While the record is not clear, presumably he remained in handcuffs throughout his time in the grand jury room. Normally one appearing before a grand jury “is entitled to no warnings of constitutional rights.” Commonwealth v. Weed, 17 Mass.App.Ct. 463, 468 (1984). Green, cuffed and transported by the Sheriff, was arguably subjected to custodial interrogation on the 9th and thus was entitled to the Miranda warnings. See Commonwealth v. Larkin, 429 Mass. 426, 434-35 (1994); Commonwealth v. Koumaris, 440 Mass. 405, 409 (2003). Regardless ofhis entitlement to Miranda warnings, what is significant is that the prosecutor misstated the Miranda rights to Green on November 9th. Green was not told he had the right to remain silent. The average grand juiy witness does not have a broad right to remain silent but instead has a right to remain silent only to the extent of his right not to incriminate himself. See United States v. Mandujano, 425 U.S. 564, 580-81 (1976). Green was the target of the investigation, a witness who, if he testified consistent with the last hour of his police interview, was bound to incriminate himself. The prosecutor told Green repeatedly he had the right to counsel but never told him counsel would be appointed for him if he was indigent. Even if Miranda warnings were not required at the outset, the misstatement of the Miranda rights was damaging. Weed, 17 Mass.App.Ct. at 469; also see Commonwealth v. Dagraca, 447 Mass. 546, 552 (2006); Novo, 442 Mass. at 271.
The prosecutor reminded Green that he had already confessed to the police. This was an inappropriate linking of the testimony of the 9th to the tainted interview on the 31st. Before the grand jury, Green expressed his ignorance as to whether he had been charged already with the murder, an indication that despite his prior involvement with the legal system, his understanding of the process was incomplete.
Green confessed to the grand jurors. At the time, he said in his own words he was testifying “because I just want to let it out that I didn’t mean, or, intend to kill anybody or any matter.” Green agreed when the prosecutor asked if he wanted to tell the truth. At the end of his testimony, Green acquiesced to the prosecutor’s leading question that he had testified, and previously confessed on the 31st, ofhis own free will.
In assessing the effect of the previous confession on the defendant’s will, one must ask if the prior confession created “a sense of futility, a belief that ‘the cat is already out of the bag.’ ” Pileeki, 62 Mass.App.Ct. at *298 509. “Fear, continuation of coercive effects, and a sense of futility of attempting to get the cat back in the bag are the objects of the analysis.” Prater, 420 Mass. at 584. Green’s responses to the prosecutor’s leading questions as to truthfulness and Green’s free will add little to the inquiry. When given the opportunity to put forth his reason for testifying in his own words, Green said he wanted the chance to say he did not intend to kill Sellers. Such a sentiment is reflective of Green’s understanding that the cat (his confession to firing the shots) was indeed out of the bag on the 31st and that now his lack of premeditation and motive needed to be expressed.
Courts have looked to a defendant’s motive to determine whether a second confession is the product of futility or something else. See e.g. Commonwealth v. Harris, 75 Mass.App.Ct. 696, 700-01 (2009) (wherein the defendant’s second statement was motivated by the defendant’s desire to exonerate his cousin); Commonwealth v. Mahnke, 368 Mass. 662, 688 (1975) (“relief at having divulged his secret at last”). When viewed in total, it is apparent that the confession on the 31st, however tainted, was in part the result of Green’s wanting to protect Schwenk from prosecution relative to the false alibi he put forth at the start of the interview. His after-the-fact love letters repeat such an intention over and over. This jurist discounts Green’s amorous correspondence when it comes to evaluating whether the confession of the 31st prompted the testimony on the 9th. Green’s letters to Schwenk are undated. Common life experience suggests that after the fact, an individual may rationalize his motives, particularly when it comes to explaining to a loved one why the individual acted against his own interest.
A determination as to the attenuation of taint from October 31st to November 9th must be made on the totality of the circumstances. Pileeki, 62 Mass.App.Ct. at 508. No single factor controls the outcome. Clearly the burden to prove attenuation is on the Commonwealth. Smith, 412 Mass. at 836. The quantum of proof is not so clear. In deciding Smithin 1992, the Supreme Judicial Court did not expressly settle the issue. However, the Court did invite favorable comparison to the level of proof beyond a reasonable doubt under the humane practice rule, citing Commonwealth v. Tavares, 385 Mass. 140, 152 (1982), in contrast with Lego v. Twomey, 404 U.S. 477, 489 (1972), which set the federal level of proof at a preponderance of the evidence. Smith, 412 Mass. at 837. The Appeals Court has expressly endorsed proof by a preponderance of the evidence, citing to pre-Tavares cases. Pileeki, 62 Mass.App.Ct. at 508; Harris, 75 Mass.App.Ct. at 699-700.[9] Perhaps this apparent variance in the level of proof can be reconciled by saying that the Commonwealth bears the burden of proving the attenuation of taint by a preponderance of the evidence and further bears the burden of proving voluntariness under the humane practice rule beyond a reasonable doubt. Nonetheless, the ultimate determination as to volun-tariness must be rendered on proof beyond a reasonable doubt.
If this motion was to be decided on temporal proximity alone, the Commonwealth would win hands down. The Commonwealth failed to prove that the purpose and flagrancy of the official misconduct on the 31st did not continue in insidious fashion through the 9th. Placing all the facts in the balance, this court finds that the Commonwealth has not proved — even by a preponderance of the evidence — a break in the stream of events or that the testimony on the 9th was free of the sense of futility that arises once the cat is out of the bag.
ORDER
For the above-stated reasons, it is ORDERED that the Defendant’s Motion to Suppress be ALLOWED as to both the defendant’s statements of October 31, 2007 and his grand jury testimony of November 9, 2007.

 In passing, it is interesting to note the local rights form used by Scipione weeks earlier was more comprehensive than the state form in that the local form had a box to be initialed by the interviewee as each aspect of Miranda was discussed.

 The court credits the above-quoted material as it appears on the recording of the interview, Exhibit 2. The court does not credit the transcription, Exhibit 3, page 58, as it is incomplete.

 The court credits the above-quoted material as it appears on the recording of the interview, Exhibit 2. The court does not credit the transcription of these lines as they appear at page 62, Exhibit 3.

 Apparently she left her wings and halo in her car in the parking lot.

 Presumably the jail’s mies were waived at Murphy’s request or at the request of the state police.

 See Smith’s testimony at MTR 1-75 through MTR 1-78.

 Neither party raised the question as to whether Green was subject to custodial interrogation on the 31st. Green was removed from his normal prison environs and remained in handcuffs throughout his time at the stationhouse. Thus there were added restraints on his freedom of movement rendering the interrogation custodial in nature. Commonwealth v. Larkin, 429 Mass. 426 (1999); also see Commonwealth v. Kownaris, 440 Mass. 405, 409 (2003).

 Detective Guiney’s opinion that Green was merely talking out loud as to whether he should or should not have a lawyer is not credited by this jurist.

 Further appellate review was granted in Harris, 455 Mass. 1108. On March 30, 2010, the Justices of the Supreme Judicial Court announced the solicitation of amicus briefs on the attenuation issue. On June 14, 2010, the appeal was dismissed on Harris’ motion (docket entries SJC-10660). Not to engage in trial court parlor games, but one cannot help but wonder whether the issue of the quantum of proof would have been reached by the high court.