NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12130

COMMONWEALTH  vs.  REGINALD HOLLEY
(and five companion cases[1]).


Suffolk.     September 8, 2017. - December 14, 2017.

Present:  Gants, C.J., Lenk, Gaziano, Budd, & Kafker, JJ.


Homicide.  Robbery.  Firearms.  Joint Enterprise.  Felony-Murder
    Rule.  Search and Seizure, Warrant, Probable cause.
    Constitutional Law, Probable cause.  Probable Cause.
    Cellular Telephone.  Jury and Jurors.  Evidence, Joint
    enterprise, Prior misconduct.  Practice, Criminal, Capital
    case, Motion to suppress, Warrant, Instructions to jury,
    Jury and jurors, Deliberation of jury, Substitution of
    alternate juror, Severance.



Indictments found and returned in the Superior Court
Department on December 12, 2012.

Pretrial motions to suppress evidence were heard by Patrick
F. Brady, J., and the cases were tried before him.


Elizabeth A. Billowitz for Reginald Holley.
Neil L. Fishman for Oasis Pritchett.
Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.

_____

    [1] Two against Reginald Holley and three against Oasis
Pritchett.

LENK, J. On the morning of October 17, 2012, Alfonso Rivas was in his apartment building anticipating a sale of marijuana to Reginald Holley when Rivas was fatally shot in the head. Holley and Oasis Pritchett were convicted of felony-murder in the first degree, armed robbery, and possession of a firearm without a license, as joint venturers, in connection with the victim's death. Prior to trial, both defendants had moved unsuccessfully to suppress text messages obtained from their cellular service provider. The text messages, which were introduced at trial, contained incriminating statements involving the defendants' plan to steal marijuana from the victim on the morning of the shooting.

In this direct appeal, Holley and Pritchett challenge the sufficiency of the evidence supporting their felony-murder convictions and the introduction of their text messages at trial. They argue also that the judge erred in declining to instruct the jury on felony-murder in the second degree, and in dismissing a deliberating juror who was ill. Pritchett argues separately that the judge erred by denying his motion to sever, admitting evidence of prior bad acts, and declining to instruct the jury on the requirements of the hearsay exemption concerning joint venturer statements. Each defendant also requests relief under G. L. c. 278, § 33E. We affirm the convictions and, after

careful review of the record, decline to set aside the verdicts or reduce the degree of guilt pursuant to our authority under G. L. c. 278, § 33E.

1. _Facts_. We recite the facts the jury could have found, reserving certain details for later discussion.

a. _The shooting_. The victim lived with his girl friend and their children in one of the two units on the third floor of an apartment building on Lyndhurst Street in the Dorchester section of Boston. The other apartment on that floor was vacant and left unlocked. The victim often used the vacant apartment to do homework and to sell marijuana to friends and close acquaintances. When selling to people he did not know well, such as individuals who had been referred to him, the victim would arrange to meet the buyers somewhere outside the apartment building. Shortly before his death, the victim had obtained a handgun to protect himself when he was selling marijuana, because he had been robbed during a previous sale. The victim stored his marijuana, and the proceeds from his marijuana sales, in empty cans of Enfamil brand baby formula.

Sometime between 9 and 10 A.M. on October 17, 2012, the victim went to the vacant apartment to do homework. His girl friend remained in their apartment to watch television. At some point while the victim was in the vacant apartment, his girl friend placed a video call to the victim and the two spoke

briefly. The victim owned a white iPhone cellular telephone that repeatedly flashed a light that resembled a "strobe light" when it rang. After the call, at around 11 A.M., the girl friend heard a "loud pop" and then a "thud." She tried to video-call the victim, but he did not respond. When she went into the hallway, she saw that the door to the vacant apartment was open and the lid of an Enfamil can was on the floor in front of the door. She entered the vacant apartment and saw the victim lying on the floor, shaking and bleeding from the head. She ran back to her apartment and telephoned 911.

Emergency medical technicians and police responded within minutes. On their way up the stairs, they noticed what they described as a burgundy Red Sox baseball cap on the second-floor landing. They entered the vacant apartment and found the victim lying face down, barely breathing, nonresponsive, and bleeding from the right side of his head. Next to the victim was a cloth bag containing a firearm. Police found the plastic lid of an Enfamil can but did not find the Enfamil container itself, nor did they find any marijuana or money. The victim's iPhone was not in the apartment. The victim was transported to the hospital, where he died a few hours later.

b. The investigation. During the course of the investigation, police examined the victim's call records and learned that the last call the victim answered before the

shooting came from Holley's telephone number.  Police then obtained information from the defendants' cellular telephone records through a warrant served on their cellular service provider, MetroPCS.[2]  Two days before the shooting, Holley sent Pritchett a text message stating, "Yo who can we stick . . . mainly for sum loud[3] . . . git da V an joint bro."  Holley then called Pritchett and spoke to him on his cellular telephone.  The next day, Holley sent a text message to the victim asking, "Bro U kno wea I can get a nice deal on a ounces of loud??"  The victim and Holley thereafter exchanged text messages in which they arranged that the victim would sell Holley two ounces of marijuana for $650; they planned to meet the following day to make the exchange.

On the morning of the shooting, Holley sent the victim a text message at 8:21 A.M. stating, "I'll be off at 9 . . . ill hit u up tho."  The victim responded, "Oo forreal . . . wasn't even hip . . But ya whenever ur ready bruh . . . Koo."

---

[2] At that time, the defendants' cellular service provider, MetroPCS, maintained copies of all text messages in the ordinary course of its business, as part of a customer's telephone records.  The victim's cellular service provider, Sprint Corporation, on the other hand, does not appear to have kept copies of its customers' text messages.  The victim's text messages that were admitted at trial were obtained through Holley's MetroPCS records.

[3] Evidence at trial established that "loud" is a slang term for high-quality marijuana.

Approximately forty minutes later, Holley sent a text message to Pritchett saying, "I got a stick . . . not a big one tho . . . its for two. Ounces of loud . . . wanna get it." The following exchange then took place:

Pritchett: "Wen"

Holley: "ASAP. Wanna meet me . . . I live on Esmond st . . ."

Pritchett: "Who u stay there wit"

Holley: "I got a roommate bro"

Pritchett: "Oh so wat u want me to do

"So wea u at now"

Holley: "I can get my Hans on a joint but then shits is too big . . . nigga got a couple rifles. SawedOff . . . no hand joints . . . u got a Hand joint

"I just got off . . . I'm getting dropped off now . . . "

Pritchett: "Off of work"

Holley: "Yea work"

Pritchett: "I got a couple"

After this exchange, Holley called Pritchett at 9:09 A.M. and spoke to him for a few minutes. Less than ten minutes later, Holley sent Pritchett a text message saying, "Dnt bro a revolver . . . cock back . . . so he Cam Hea it."

At 9:37 A.M., Pritchett called Holley.  Cell site data[4] records show that, during that call, Pritchett's cellular telephone connected to a cellular telephone tower (cell tower) near his home on Blue Hill Avenue, while Holley's cellular telephone connected to a cell tower near his home on Esmond Street.  Between 9:44 and 9:49 A.M., Pritchett's cellular telephone connected with a cell tower further from his house, on a route leading to Holley's house.

Between 9:54 and 9:58 A.M., Pritchett and Holley exchanged text messages to coordinate a meeting at Holley's house.  At 10:01 A.M., Pritchett called Holley.  Pritchett's cellular telephone connected to a cell tower on Talbot Avenue, closer to Holley's house, while Holley's cellular telephone connected to a cell tower on his street.  When Pritchett called Holley again two minutes later, both of their cellular telephones used the same cell tower on Holley's street.

---

[4] Cellular telephone towers, also known as cell sites, contain antennae and electronic communications equipment that enable cellular telephones to place and receive calls.  At the time of the defendants' trial, there were over 1,000 Sprint Corporation cell sites in Boston and "a lot" of MetroPCS sites. Cellular telephones usually connect to the tower nearest to them that has the strongest signal.  A cell tower that is physically closer to the location of a particular cellular telephone would not be used for the connection if the signal from that tower is weaker, or if it is too busy.  While the precise location of a particular cellular telephone cannot be determined from cellular telephone records, those records do show the tower to which a cellular telephone connected when it placed or received a specific call.

At 10:22 A.M., Holley sent the victim a text message saying "I'm bout to head down their . . ." and the victim responded, "Koo." At 10:29 A.M., Holley replied, "15 min," and the victim responded, "Ok." Video surveillance footage from the entryway of the victim's building showed the victim walk down the interior stairs, prop open the interior entry door, and then walk back up the stairs at 10:30 A.M.[5]

At 10:54 A.M., Holley's cellular telephone connected to a cell tower at an intersection that was just a few blocks from the victim's apartment. At 10:56 A.M., Holley's telephone connected with a cell tower approximately several blocks away from closer to the victim's apartment. At the same time, the victim's call records show that he answered a call from Holley; at that point, the victim's telephone connected to a tower a few blocks from his apartment. This was the last time a call was answered from the victim's cellular telephone.

Footage from the video surveillance cameras in the victim's apartment building showed two young, African-American males enter the building at 10:57 A.M. that morning. One was wearing

---

[5] To enter the victim's apartment building, a visitor would have to pass through two sets of doors at the entrance. A resident could unlock the first entryway door remotely for a visitor using an intercommunication device (intercom), which would permit the visitor to enter the vestibule. The second entryway door, however, had to be manually opened from inside in order for a visitor to gain access to the apartments and the stairwell.

a gray hooded sweatshirt with a dark coat over it and a maroon baseball cap; he was speaking on a cellular telephone as he climbed the stairs.  The other was wearing a black, white, and red plaid jacket with the hood up and a dark vest over it.  The surveillance video showed the same two individuals run down the stairs and out of the building at 11 A.M.  As they ran out, the first individual, with the gray sweatshirt, was no longer wearing the baseball cap.  The police reviewed the footage from all surveillance cameras in the front and back of the building from approximately 10:15 A.M. until 11:05 P.M. that day, but saw no other significant activity.  Investigating officers also reviewed surveillance footage taken from a nearby post office, which had cameras that showed the entrance to the victim's building.  On this footage, the same two individuals can be seen entering the victim's building.

At approximately the same time as the events on the video surveillance footage, two people were involved in an automobile accident on the street where the victim lived.  They were exchanging insurance information when they heard a loud bang; one ducked and said, "Someone's shooting."  Approximately one minute later, the man involved in the accident (the witness) saw two men come out of the victim's apartment building.  They walked past in a rush, scanned up and down the street, and began running toward Allston Street, in the direction of the

Massachusetts Bay Transportation Authority's (MBTA) Shawmut station.  The men were wearing several layers of clothing and jackets.[6]  The witness had been on the street approximately twenty to thirty minutes before he saw the two men leave the victim's apartment building; in that time, he did not see anyone else enter that building.

Video surveillance from the MBTA shows the two individuals who had entered and left the victim's apartment building arriving at the Shawmut MBTA station at 11:04 A.M.[7]  They bought one ticket that they both used to walk through the turnstile.  The men walked down the stairs to the inbound platform and sat on a bench.  The one wearing the grey sweatshirt pulled a light-colored cylindrical object out of his clothing and placed it under the bench,[8] and then the two stood up and walked away.  The two men then took a different set of stairs to the outbound platform.

---

[6] The witness described both men as young, tall, and African-American.  He observed that one of them had braided "cornrows" in his hair and was wearing a red jacket, and the other was wearing an olive green jacket with a hood.

[7] Both of their hoods were down, showing that both had their hair in "cornrows."

[8] The man in the video footage appeared to be Holley.

At 11:17 A.M.,[9] the ticket the two men had used to enter Shawmut station was used on the 815 MBTA bus from Ashmont station, one station away from Shawmut on the MBTA's Red Line. Video surveillance from the 815 bus shows the same two men get on the bus at Ashmont station and sit down next to each other; the bus headed back in the direction from which the men had come, toward the victim's home.  Two minutes before the video footage showed the two men getting onto this bus, Pritchett's cellular telephone had connected with a cell tower a few blocks from Ashmont station.

Between 11:15 A.M. and 12:29 P.M., the defendants collectively received approximately one dozen calls that connected from cell towers located on MBTA Route 23, the route of the 815 bus, which ran along Washington Street from Ashmont station to a bus stop a few blocks away from Pritchett's house on Blue Hill Avenue.  At 11:22 A.M., the surveillance video from the 815 bus shows that one of the two men[10] pulled from his pants pocket a black cellular telephone and then a white cellular telephone, which was flashing a light resembling a strobe light;

_____

[9] Due to technical difficulties, the bus's time stamp was seventeen hours and fifty minutes earlier than the actual time.

[10] The man in the video footage appeared to be Pritchett.

he manipulated the device with the flashing light.[11]  According to the victim's cellular telephone records, his telephone received a call at approximately the same time, which connected to a cell tower near the 815 bus's location along Route 23; the call went unanswered.  A few minutes later, Pritchett's and Holley's telephones each connected with a nearby cell tower.

At 11:32 A.M., the MBTA surveillance footage shows the individual again take out the telephone with the flashing light.  At the same time, the victim's cellular telephone received another call; that call connected to a cell tower on the Sprint network that is approximately six blocks from the MetroPCS tower that Holley's telephone connected with at 11:32 A.M.[12]  On the video footage, the individual handed the flashing telephone to an unidentified man then sitting next to him,[13] who manipulated the telephone so that it stopped flashing.  The victim's cellular telephone records showed no further activity after

---

[11] When police seized Pritchett's cellular telephone, it did not have a flashing feature.

[12] Because the victim's cellular telephone provider, Sprint, Corp., was different from that of the defendants, who used MetroPCS, the cell towers that the victim's telephone connected to were different from those used by the defendants' telephones.

[13] When the unidentified man got onto the bus, he appeared to recognize the man who looked like Pritchett.  A short time later, the man who looked like Pritchett left his seat next to the man resembling Holley and sat down next to this unidentified man at the back of the bus.  The two men appeared to have been talking when the telephone started flashing.

11:32 A.M., and the telephone did not connect to any cell towers after that time.

At 11:42 A.M., the two individuals got off the bus at the stop closest to Pritchett's house.  At 11:52 A.M., and again at 1:39 P.M., Holley's telephone connected with a cell tower one block from Pritchett's house.  Pritchett's telephone connected to the same tower at 12:29 P.M.

At 2:35 P.M., Holley sent a text message to Pritchett saying, "I'm home."  A little over one hour later, Holley sent another message:  "He died."  Pritchett asked, "How u kno," and Holley responded, "Word of mouth."  Approximately one and one-half hours later, Holley sent a text message to Pritchett saying, "U good bro."  Beginning at 6:56 P.M., and continuing into the next day, Holley also sent the following texts to third parties: "I got loud on deck"; "Babe cum blow this loud"; "Loud on deck"; Kush on deck"; and "I got Kush for sale."

Between 1:50 A.M. and 2:25 A.M. on the morning after the shooting, Pritchett engaged in the following text message exchange with a third party:

Pritchett:  "I fucked up"

Third party:  "So whos prego"

Pritchett:  "No no no real shit pj"

Third party:  "So baby wats wrng"

"Jus do it"

"Please jus tell me"

"U didnt do kno hot shit rite"

Pritchett:  "Yea"

Third party:  "Wat u mean o waT u doin out here"

"Tlk nigga"

Pritchett:  "I fucked up"

"Dont b saying anything i fucked up"

Third party:  "Im not wtf say sumthn o"

"Is that all u keep sayn"

Pritchett:  "Sumthin happend today I might go down for it"

Third party:  "I need to c u tonite if dats da case ur gonna leave me lonely out here n these streets"

Pritchett:  "Im sorry im good tho i hope"

Third party:  "I wanna c u"

"Well I hope thngs work out for u luv u it cnt b dat serious cuz u would wanna c me as i would u u wont even tlk to me so Iono ttyl"

Pritchett:  "I have go sumwhere i will c u tomorrow"

Third party:  "U cnt call me n tell me u love me"

"God forbid u do go dwn jus kno ima rememba dis so dnt expect shit frm me"

Pritchett:  "On my life u need to chill"

Investigating officers also reviewed surveillance footage obtained from Holley's employer, United Parcel Service, for the

week of October 16-19, 2012.  The footage from the days Holley appeared at work showed that on October 16 and October 17 (the morning of the shooting), Holley wore a maroon Boston Red Sox baseball cap to work.  On October 19, however, he wore a different hat.

c.  Forensic evidence.  Police searched the victim's apartment building and several items from the vacant apartment, including the baseball cap, for fingerprints.[14]  None of the viable fingerprints were a match to Pritchett or Holley's fingerprints.  Police also examined footprints found at the crime scene.  None matched the shoes collected from Holley, Pritchett, or the victim.[15]  Some "reddish brown stains" from the entryway to the building, the baseball cap, Holley's jacket, and Pritchett's shoes were submitted to the police crime laboratory for deoxyribonucleic acid (DNA) testing.  Test results indicated that Holley was one of two possible contributors to the DNA from the baseball cap and the jacket; the victim was a contributor to the stains in the front entryway.  The stains on the shoes were insufficient for DNA testing.

_____

[14] Police seized a number of other objects as well, including a Pepsi can, a white plastic bottle, a Brisk lemonade bottle, and an Enfamil container.

[15] Bloody footprints near the victim were later determined to have been made by first responders providing medical assistance.

d.  Firearm evidence.  The Commonwealth presented evidence that, a few days before the shooting, Pritchett was hired to help a doctor clean out the house of his late uncle.  The doctor had brought a friend, and had hired a contractor and his assistant, Pritchett, to go through the uncle's house room by room, sorting items to keep and items to be discarded.

The uncle owned two guns that he kept in a red bag:  a Taurus Model 85 .38 caliber revolver and a Jennings .32 caliber semiautomatic pistol.  The bag also contained bullets, a cleaning kit, and the receipts for the handguns.  The doctor had placed the uncle's bag in a separate pile of items that he was planning to keep.  After the cleaning was completed and Pritchett and the mover left, the doctor went to check on the pile of items he planned to keep.  The red bag was still in the pile, with the bullets, receipts, and cleaning kit inside, but the two handguns were missing.

The doctor spoke to his friend about the missing guns; the friend suggested that he call the mover.  The mover disclaimed any knowledge.  The mover then called Pritchett, who told the mover that he had no knowledge of the missing guns.  The next day, however, the doctor's friend sent a text message to Pritchett, saying, "Hey man dude noticed guns are gone and he's gona call [the mover] and ask him.  I said I don't know anything so just say you don't either."  Pritchett responded, "We might

of thought them in the trash."  The doctor's friend responded, "That's what I said but he said the bag they were in is still there.  So just say you don't know anything like I did and well be cool."  Pritchett answered "Ok."  The doctor never located the guns.

A ballistics expert analyzed bullet fragments from the victim's body and generated a list of many potential firearms that could have fired the bullet.  When asked during cross-examination whether the Taurus model 85 could have fired the bullet, even though it had not been included in his initial report, the expert testified that he could not exclude such a firearm as the possible weapon.  The expert also determined that the Jennings pistol could not have fired the bullet that killed the victim.

2.  Procedural history.  The defendants were indicted on charges of murder in the first degree in violation of G. L. c. 265, § 1; armed robbery in violation of G. L. c. 265, § 17; and possession of a firearm without a license in violation of G. L. c. 269, § 10 (a).  The Commonwealth's motion to join the defendants' trials was allowed over the defendants' objections. Prior to trial, both defendants also sought to suppress the text

messages obtained from MetroPCS;[16] their motions were denied.[17] The Commonwealth moved in limine to introduce evidence of the firearms that were missing from the doctor's uncle's house; that motion was allowed over Pritchett's objection. The defendants were convicted of all charges. The Commonwealth proceeded at trial on theories of deliberate premeditation and felony-murder; however, the defendants were convicted only on the theory of felony-murder.

3. Discussion. a. Sufficiency of the evidence. The defendants argue that there was insufficient evidence of felony-murder because the predicate offense of armed robbery and the death of the victim were both based on a single gunshot, rather than arising from two separate assaults. A conviction of felony-murder requires that the predicate felony be based on conduct that is independent of the act necessary for the killing. Commonwealth v. Bell, 460 Mass. 294, 300 (2011), S.C., 473 Mass. 131 (2015), cert. denied, 136 S. Ct. 2467 (2016).

---

[16] At trial, and on appeal, the defendants did not object to the admission of cell site data or call logs but, rather, challenged the admissibility of "stored content," meaning, in this context, the content of their text messages.

[17] The investigating officers had obtained two independent sets of warrants to search both of the defendants' cellular telephones and their MetroPCS records. The language of the two sets of search warrants is substantially the same. In our discussion, we address the language in the warrants to search MetroPCS records, as only those records were introduced at trial.

"This requirement ensures that not every assault that results in a death will serve as a basis for murder in the first degree on the theory of felony-murder." Commonwealth v. Scott, 472 Mass. 815, 819 (2015). "If an assault that is an element of an underlying felony is not separate and distinct from the assault that results in the death, then the assault is said to merge with the killing, in which case the underlying felony cannot serve as a predicate felony for purposes of the felony-murder doctrine." Id.

Generally, a determination whether a killing merges with the underlying felony must be assessed on a case-by-case basis. Commonwealth v. Kilburn, 438 Mass. 356, 359 (2003). Here, however, the judge noted that his decision was constrained by Commonwealth v. Christian, 430 Mass. 552, 556 (2000), overruled on other grounds by Commonwealth v. Paulding, 438 Mass. 1 (2002), in which this court explained that it could "envision no situation in which an armed robbery would not support a conviction of felony-murder."

Notwithstanding Holley's arguments to the contrary, the court's holding in Christian, supra, on the issue of felony-murder has not been abrogated. The merger doctrine is inapplicable in cases where the purpose of the predicate felony is distinct from an intent to cause physical injury or death. Commonwealth v. Morin, 478 Mass. 415, 430 (2017). For armed

robbery, the elements of the crime are that "a defendant, while armed with a dangerous weapon, assaulted another person, and took money or property from the person with the intent to steal it." Commonwealth v. Anderson, 461 Mass. 616, 633, cert. denied, 568 U.S. 946 (2012), citing G. L. c. 265, § 17. Christian, 430 Mass. at 556, explained that it is "the stealing or taking of property[] that qualifies them for application of the felony-murder rule." Otherwise put, it is the intent to steal, rather than the intent to assault, which is substituted for malice. Since intent to steal does not cause a homicide, the armed robbery does not merge with the killing. Morin, supra at 431. Accordingly, the merger doctrine is inapplicable in this case, and there was sufficient evidence to support the defendants' convictions of felony-murder in the first degree.

Pritchett also argues that his felony-murder conviction must be reversed because it is undisputed that the victim did not die during the armed robbery but, rather, died several hours later at the hospital. He points to cases such as Commonwealth v. Ortiz, 408 Mass. 463, 465 (1990), and Commonwealth v. Hanright, 466 Mass. 303, 307 (2015), abrogated on other grounds by Commonwealth v. Brown, 477 Mass. 805 (2017), which explain that felony-murder imposes liability where a death occurred "in the course of" a felony or criminal enterprise. Pritchett's reading of these cases is too narrow. In Hanright, supra, the

court explained that the homicide must follow "naturally and probably from the carrying out of the joint enterprise" (citation omitted), such that the intent to commit the underlying felony is substituted for the malice aforethought required for the murder.  Similarly, in Ortiz, supra at 466, we explained that "the killings and the felonious carrying [of a firearm in a motor vehicle] need only to have occurred as part of one continuous transaction.  It was not necessary for the Commonwealth to show that the homicides occurred while the [felony] was still in progress, as long as the homicides were connected with and incident to the [felony] and as long as the [felony] and the homicides took place at substantially the same time and place."  Here, it was sufficient that the fatal shot was delivered during the course of the armed robbery; that the victim died a few hours later does not negate the fact that the victim was killed in the course of the armed robbery.

b.  Motions to suppress text messages.  Both defendants argue that the motion judge, who was also the trial judge, erred in denying their motions to suppress the content of their text messages obtained from MetroPCS.[18]  Specifically, they contend

---

[18] As stated, the defendants do not challenge that there was probable cause to obtain the cell site data and subscriber information.  In light of the video surveillance footage and the victim's telephone records, we discern no error in the admission of this evidence.

that the warrants to obtain those records were not supported by probable cause and also were lacking particularity.  After reviewing the search warrant applications and supporting affidavits, we conclude that both were supported by probable cause.  In addition, to the extent that the warrants were lacking particularity, there was no prejudice to the defendants by the introduction of their text messages at trial.

i.  Holley's text messages.  A.  Probable cause.  Both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights "require a magistrate to determine that probable cause exists before issuing a search warrant" (citation omitted).  Commonwealth v. Cavitt, 460 Mass. 617, 626 (2011).  Probable cause means a "substantial basis" to conclude that "the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues" (citations omitted).  Commonwealth v. Kaupp, 453 Mass. 102, 110 (2009).  There must be probable cause to conclude not only that an individual committed a crime, but also that the particular source of evidence has a "nexus" to the offense (citation omitted).  Commonwealth v. White, 475 Mass. 583, 588 (2016).  While "definitive proof" is not necessary to meet this standard, the warrant application may not be based on mere speculation.  Commonwealth v. Augustine, 472 Mass. 448, 455

(2015); Commonwealth v. Cinelli, 389 Mass. 197, 213, cert.

denied, 464 U.S. 860 (1983) (even "strong reason to suspect is

not adequate").

"When considering the sufficiency of a search warrant

application, our review 'begins and ends with the four corners

of the affidavit.'" Commonwealth v. Dorelas, 473 Mass. 496,

500-501 (2016), quoting Cavitt, 460 Mass. at 626. The affidavit

is "considered as a whole and in a commonsense and realistic

fashion"; it is not "parsed, severed, and subjected to

hypercritical analysis" (citations omitted). Dorelas, supra.

"All reasonable inferences which may be drawn from the

information in the affidavit may also be considered as to

whether probable cause has been established." Commonwealth v.

Donahue, 430 Mass. 710, 712 (2000). A magistrate's

determination of probable cause is accorded "considerable

deference." Commonwealth v. McDermott, 448 Mass. 750, 767,

cert. denied, 552 U.S. 910 (2007).[19] Probable cause is a "fact-

---

[19] The Commonwealth points out that, here, the content of
the text messages admitted at trial was not obtained through
forensic searches of the defendants' cellular telephones, as it
was in Commonwealth v. White, 475 Mass. 583, 586-587 (2016),
Commonwealth v. Dorelas, 473 Mass. 496, 500 (2016), and other
cases the defendants rely upon, but rather through the records
of the cellular telephone service provider. This distinction is
immaterial. Regardless of whether the text messages were stored
only on the defendants' cellular telephones or also on their
service providers' servers, police could not seek a warrant to
recover the contents of those text messages without establishing

intensive inquiry, and must be resolved based on the particular facts of each case." Morin, 478 Mass. at 426.

There was a substantial basis to conclude that Holley's text messages were related to the crime under investigation. The warrant affidavit discussed information contained in the victim's call records and the apartment surveillance footage in order to establish that Holley used his cellular telephone to call the victim immediately prior to the shooting, just as Holley was entering the victim's apartment building, where the victim was ultimately shot. The affiant also stated that the victim's girl friend had told him that the victim sold marijuana from the vacant apartment and kept his marijuana in Enfamil cans. The girl friend had observed an Enfamil can top, but not

---

a nexus between the homicide and the defendants' cellular telephone communications. See Commonwealth v. Fulgiam, 477 Mass. 20, 34, cert. denied, 86 U.S.L.W. 3177 (2017) (individual has objectively reasonable expectation of privacy in text messages, regardless of whether they are stored in that person's cellular telephone or on service provider's server); White, supra at 588 ("the government must demonstrate a nexus between the crime alleged and the article to be searched or seized" [quotations and citation omitted]).

The Commonwealth argues also that the defendants did not have a reasonable expectation of privacy in the content of the third-party business records from which the content of the text messages was obtained. We rejected this argument in Fulgiam, supra, issued after the Commonwealth filed its brief in this case, wherein we held that the third party doctrine is "inapposite . . . with respect to the content of text messages stored on a cellular telephone service provider's servers" (quotations and citation omitted).

the container, near the victim's body.  The shooting was therefore likely connected to a drug deal, which the affiant explained commonly is arranged by a telephone call "to verify contact and to arrange for the transaction."  Contrast White, 475 Mass. at 589 ("the opinions of the investigating officers do not, alone, furnish the requisite nexus between the criminal activity and the [device] to be searched or seized" [emphasis added, quotations and citation omitted]).

The victim's girl friend also told the affiant that "it was unusual for the victim not to have his phone with him."  Moreover, she had tried to video-call the victim while he was in the vacant apartment that morning, from which it reasonably may be inferred that the victim had had his cellular telephone in his possession, and yet his telephone was not found at the scene of the crime.  From this information, the affidavit reasonably inferred that "people involved in the victim's homicide may have taken the victim's phone to hide any information such as recent contact information and caller history."

The motion judge properly concluded that there was a nexus between Holley's text messages and the shooting, even though the warrant affidavit did not state specifically that Holley was sending text messages.  A nexus also may be "found in the type of crime, the nature of the items sought, and the normal inferences as to where such items might be kept by the suspect."

Commonwealth v. Matias, 440 Mass. 787, 794 (2004).  See, e.g.,

Dorelas, 473 Mass. at 503 (defendant's receipt of threatening

calls and text messages on his cellular telephone supported

reasonable inference that his photograph files, and not just his

calls and text messages, would contain evidence of contentious

communications in days leading up to shooting).  Here, it was

reasonable to infer that Holley's cellular communications were

instrumental in committing the crime because Holley called the

victim as he was entering the victim's apartment building only a

few minutes before the shooting.  Thus, there was probable cause

to search for contemporaneous communications that were related

to the criminal activity under investigation, which includes

real-time text messages.[20]  Contrast White, 475 Mass. at 591

(only connection between fatal armed robbery and defendant's

cellular telephone was speculation in warrant affidavit that

---

[20] Holley argues that the Commonwealth's contention in its
brief that the content of Holley's text messages would help
police identify the shooter is "disingenuous at best," because
all that was necessary to determine the identity of the person
the victim communicated with on the morning of the shooting was
to request the subscriber information associated with the
telephone number.  In addition, Holley argues, police already
knew his identity before seeking the search warrant for his
cellular telephone.  Holley's argument is unavailing.  Holley
does not point to, and we are not aware of, any support for the
proposition that the police are required to limit themselves to
one source for each piece of information obtained during the
course of an investigation.  That police found other
incriminating information in Holley's text messages, beyond the
fact of his identity, is immaterial.

cellular telephone was related to crime because cellular telephones are "necessary to social interactions"); Commonwealth v. Broom, 474 Mass. 486, 496-497 (2016) (only connection between fatal aggravated rape and defendant's cellular phone was conclusory statement in search warrant affidavit that "cellular telephones contain multiple modes used to store vast amounts of electronic data" and that there was "probable cause to believe that the [defendant's] cell phone and its associated accounts . . . will likely contain information pertinent to this investigation.").

B. Particularity. "The Fourth Amendment, art. 14, and G. L. c. 276, § 2, require that a search warrant describe with particularity the places to be searched and the items to be seized." Perkins, 478 Mass. 97, 106 (2017). The dual purposes of the particularity requirement are "(1) to protect individuals from general searches and (2) to provide the Commonwealth the opportunity to demonstrate, to a reviewing court, that the scope of the officers' authority to search was properly limited." Commonwealth v. Valerio, 449 Mass. 562, 566-567 (2007). We have cautioned that "given the properties that render [a modern cellular telephone] distinct from the closed containers regularly seen in the physical world, a search of its many files must be done with special care and satisfy a more narrow and demanding standard." Dorelas, 473 Mass. at 502.

The warrant to search Holley's cellular telephone records sought the following information from October 1 through October 18, 2012:[21]

> "[S]ubscriber information; billing records and detailed airtime; outbound call detail; call origination and termination location; stored GPS location information, and/or stored cellular tower records, cell tower sector information, range from cell tower information (RTT) and physical address of cell sites; and all stored contents of electronic or wire communications including stored or deleted voicemail, read, unread, deleted, or sent electronic mail or text messages, and stored files; and listing of all associated phone numbers, of a subscriber to or customer of such service."

That the warrant sought "all stored contents of electronic or wire communications" and "stored files" in Holley's cellular telephone records for seventeen days raises significant concerns as to whether the warrant was "sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search" (citation omitted). Dorelas, 473 Mass at 511 n.8 (Lenk, J., dissenting). See

---

[21] Although the warrants for Pritchett and Holley's MetroPCS records did not contain any time limitation, the supporting affidavits did; the affidavits asked only for records for the period from October 1 through October 18, 2012, and MetroPCS only produced the text messages for that time period. See Commonwealth v. Valerio, 449 Mass. 562, 570 (2007) ("despite a warrant's technical violation for lack of particularity, when the items intended to be seized are listed in an attached affidavit, and the affidavit is incorporated into the warrant and present at the scene of the search, exclusion of evidence does not necessarily follow").

Perkins, 478 Mass. at 106 ("By defining and limiting the scope
of the search, these constitutional and statutory particularity
requirements prohibit general warrants amounting to exploratory
rummaging in a person's belongings" [quotations and citation
omitted]).

The warrant here was hardly a model of particularity, and
did not sufficiently limit the scope of the search so as to
prevent "exploratory rummaging."  See id.  The record is silent,
however, as to how MetroPCS conducted its search in order to
comply with the warrant, and does not indicate what information,
if any, MetroPCS provided to the Commonwealth beyond Holley's
text messages.  Indeed, it is unclear from the record whether
MetroPCS even kept any stored content apart from text messages
as part of its business records.  See Commonwealth v. Sheppard,
394 Mass. 381, 390 (1985) (exclusion not warranted where record
demonstrated that officers did not exploit defect in warrant and
properly limited scope of their search such that defendant was
not prejudiced by lack of particularity).  The only stored
communications used at trial consisted of Holley's text
messages, which the Commonwealth had redacted so that only the
content relevant to the crime under investigation was presented
to the jury.  The redacted text messages were all sent or
received in the two days before the shooting, when the drug
transaction was arranged; on the day of the shooting, when the

crime was carried out; or on the day after the shooting, when Holley discussed the disposition of the proceeds of the armed robbery. On this record, Holley suffered no prejudice because the text messages were sufficiently limited in content and scope such that the Commonwealth did not capitalize on the lack of particularity in the warrant. We cannot say that the judge erred in denying the motion to suppress on this basis.

ii. Pritchett's text messages. A. Probable cause. The search warrant affidavit to obtain Pritchett's cellular telephone records contained all of the relevant facts included in the warrant for Holley's records, as well as additional information developed during the course of the investigation. Viewing the warrant affidavit as a whole, and drawing reasonable inferences from the information contained in it, there was a sufficient nexus between the criminal activity under investigation and Pritchett's text messages.

The affidavit described the video footage of two men resembling Pritchett and Holley entering the victim's apartment building minutes before the shooting, while the one resembling Holley was talking to the victim on his cellular telephone, and both men then running out together approximately three minutes later. It noted that, in the MBTA surveillance footage, Pritchett "appear[ed] to be texting on a cell phone" as he was fleeing the scene with Holley. The affidavit also stated that

during "a post Miranda audio and video recorded statement Pritchett puts himself at [the victim's apartment building] with Holley, when the marijuana was taken from the victim after the victim was shot."

The affidavit further stated that the victim's cellular telephone, which the girl friend had tried to video-call before the shooting, was missing, inferably because it contained content implicating the perpetrator.  And again, it noted that an Enfamil top, but not the container in which the victim stored his marijuana, was near the victim's body, so the crime likely involved a drug deal, which was commonly arranged by a telephone call.  The warrant affidavit also contained information that Holley and Pritchett had different home addresses but arrived at the victim's house together.  Given that both Pritchett and Holley had used their cellular telephones during the time span of the crime, it was reasonable to infer that Pritchett's cellular communications contained evidence of his having arranged to meet with Holley before they entered the victim's building together.

While none of these facts in isolation would be sufficient for probable cause, the relevant inquiry is whether the inferences drawn are reasonable in light of the affidavit as a whole.  See Dorelas, 473 Mass. at 500-501; Donahue, 430 Mass. at 712.  As with Holley, the fact that police did not know to a

certainty that Pritchett was using his cellular telephone to communicate regarding the crime under investigation is not dispositive as to the question of nexus. See Matias, 440 Mass. at 794. Although it is a closer case, the affidavit's detailed information connecting Pritchett and his cellular telephone communications to the scene of the crime at the time of the shooting supports the reasonable inference that his text messages were related to the crime under investigation. Compare Commonwealth v. Keown, 478 Mass. 232, 239 (2017) (probable cause to search defendant's computer because warrant affidavit established that he was sophisticated with computers and had forged documents related to proffered motive for poisoning his wife, and supported reasonable inferences that he used his computer to forge those documents and to research poison), with Morin, 478 Mass. at 427 (warrant affidavit lacked probable cause to search defendant's cellular telephone because it merely stated that codefendant, who had brought victim of shooting to hospital, telephoned defendant at unspecified times before and after homicide).

This case is unlike Commonwealth v. Fulgiam, 477 Mass. 20, 34, cert. denied, 86 U.S.L.W. 3177 (2017), in which we concluded that the fact that a defendant communicated with his codefendant on the day of the victims' deaths "elevated their relationship to a matter of importance in the investigation, [but] did not,

without more, justify intrusion into the content of that communication."  In that case, the police had information that the defendant had been in contact with his codefendant and a victim by telephone on the day the victims were killed, and knew that his codefendant and one of the victims conducted drug sales together.  Id.  We determined that probable cause for the requisite search warrant was lacking because there were no facts that "implicated [the defendant] in the crimes or suggested that the content of his text message would aid in the apprehension of a suspect in the murders."  Id. at 35.  Here, by contrast, the warrant affidavit was not based merely on Pritchett's association with Holley.  Instead, it showed both that Pritchett was directly implicated in the crime and that his contemporaneous cellular communications, including text messages, were inferably related to the criminal activity under investigation.

B.  Particularity.  As with the warrant seeking Holley's telephone records, the warrant for Pritchett's MetroPCS records lacked particularity because it, too, sought "all stored contents of electronic or wire communications" and "stored files," and authorized a search of seventeen days of records.[22]

---

[22] The content sought in the warrant for Pritchett's cellular telephone records was identical to that sought in the warrant for Holley's MetroPCS records.

Again, the record is silent as to the scope of the search conducted or the information produced as a result of this warrant. The only stored content presented to the jury consisted of text messages related to the crime that were exchanged in the period beginning from four days before the shooting, when Pritchett exchanged text messages with the doctor's friend about the missing handguns, until the early morning hours after the shooting, when Pritchett told the third party that he "may go down for" something that had happened on the day of the shooting. Pritchett was not prejudiced by the scope of the warrant, as the Commonwealth did not exploit the lack of particularity. Again, we cannot say on the record before us that the judge erred in denying Pritchett's motion to suppress on this basis.

c. Instruction on felony-murder in the second degree. Pritchett and Holley both argue that the judge erred in declining to instruct the jury on felony-murder in the second degree, premised on the underlying charge of possession of a firearm without a license. "As a general matter, there is no black-letter catalogue of predefined felonies deemed on a per se basis to be predicates for invocation of felony-murder in the second degree." Commonwealth v. Garner, 59 Mass. App. Ct. 350, 357 (2003). Rather, an instruction on felony-murder in the second degree is necessary "when there is a rational basis in

the evidence to warrant the instruction. " Bell, 460 Mass. at 306-307, quoting Christian, 440 Mass. at 558. Specifically, there must be evidence from which the jury could find that the felony was "inherently dangerous or the defendant acted with conscious disregard for the risk to human life. " Bell, supra at 308, quoting Christian, supra.

As a matter of law, possession of an unlicensed firearm is not inherently dangerous. "Decisional law has identified certain felonies that are inherently dangerous as a matter of law, such as arson, rape, burglary, armed robbery, and armed home invasion, . . . because the risk to human life is implicit in the intent required for any such felony" (citations omitted). Commonwealth v. Fantauzzi, 91 Mass. App. Ct. 194, 199 n.6 (2017). Unlawful possession of a firearm does not fall within this category. Id.

Nor was there evidence in this case to suggest that the manner or circumstances of the possession of the firearm without a license showed conscious disregard for human life. The situation here is different from that in Ortiz, 408 Mass. at 467, where the defendant was convicted of felony-murder in the second degree in connection with his brother's shooting of two police officers. There, the jury could have found, on the evidence before them, that the defendant possessed a firearm "with conscious disregard for the risk to human life because of

the obvious risk presented by the defendant and his brother's driving around with a loaded .357 Magnum revolver between them looking for an individual with whom their family had a longstanding feud."  This case is also unlike Garner, 59 Mass. App. Ct. at 358, where the Appeals Court held that there was sufficient evidence of felony-murder in the second degree because the defendant had smuggled a loaded revolver into a nightclub "crowded with dancers moving about and people drinking alcoholic beverages."  That nightclub had been the scene of prior shootings, resulting in the implementation of search protocols, which the defendant deliberately subverted by smuggling firearms into the venue on several occasions.  Id.  In sum, given the evidence presented at trial, the judge did not err in determining that an instruction on felony-murder in the second degree based on the felony of the unlicensed possession of a firearm was unwarranted.

d.  Dismissal of ill juror.  The defendants contend that a new trial is required because the judge did not follow necessary procedures in dismissing a juror who fell ill during deliberations.  This argument was not preserved, so we consider whether there was a substantial likelihood of a miscarriage of justice.  Commonwealth v. Tolan, 453 Mass. 634, 648 (2009).

A judge may replace a juror in the midst of deliberations if that juror "dies, or becomes ill, or is unable to perform his

duty for any other good cause shown to the court" (citation omitted). Commonwealth v. Connor, 392 Mass. 838, 844 (1984). "[O]nly reasons personal to a juror, having nothing whatever to do with the issues of the case or with the juror's relationship with his fellow jurors," may constitute good cause. Id. at 844-845. A "judge must hold a hearing adequate to determine whether there is good cause to discharge a juror." Id. at 844.

On the second day of deliberations, the juror requested an ambulance because she felt ill and unable to move. The next day, in the presence of the parties, the judge telephoned her. She said that she had a fever of 104 degrees and had been diagnosed with the flu. The doctor told her she should not return to the jury for seven days because her illness was communicable. The judge found that the juror's illness constituted good cause, and that excusing her "ha[d] nothing to do with her stance on the issues or anything having to do with the merits of the case or of her personal relations with the other jurors."

The defendants contend that the judge committed reversible error because he did not (1) hold a formal hearing, swear her in, and permit the attorneys to question her; (2) inform the juror that she could not be discharged unless she had a personal problem unrelated to her relationship with the other jurors or

her views about the case; or (3) tell the jury to disregard their previous deliberations.

These arguments elevate form over substance. As Connor, 392 Mass. at 843-844, explains, whether the juror needs to be present at the hearing where the juror's dismissal in being considered depends on the circumstances of a particular case. See id. at 844 n.2 ("Depending on the nature of the reason why replacement of the juror is being considered, the juror's presence may or may not be required"). Unlike in Connor, supra at 842-843, where a juror refused to deliberate or keep his oath, the juror's illness in this case was clearly a personal problem. Additionally, whereas in Connor, supra at 842, the judge spoke to the juror outside the presence of counsel and did not hold a hearing or make any findings, here the judge telephoned the juror in the presence of counsel, questioned her, invited counsel to suggest further questions,[23] and made specific findings of good cause. Additional procedures would not have altered his findings, and at trial all of the parties agreed that the juror should be dismissed.

---

[23] The judge properly rejected defense counsel's request that he ask the juror about her ability to deliberate, as that question came close to touching upon the content of the deliberations. See Commonwealth v. Connor, 392 Mass. 838, 844 (1984) ("In dealing with all aspects of the problem of discharging a deliberating juror, the utmost caution is required to avoid invading the province of the jury").

Additionally, after an alternate juror was sworn in, the judge instructed the jury to begin their deliberations "anew with a new jury of twelve people" and told them "not to simply pick up where [they] left off." These instructions are sufficient to meet the requirement set forth in Connor, 392 Mass. at 844 n.2, that the judge "instruct the jury to disregard all prior deliberations and begin its deliberations again." See Commonwealth v. Zimmerman, 441 Mass. 146, 151 (2004) ("A judge is not required in every case to adhere to the precise language we used in [Connor]"). Accordingly, the judge did not err in dismissing the ill juror during the jury's deliberations.

e. Motion for severance. Pritchett separately argues that that the judge erred in denying Pritchett's motions to sever the defendants' trials, an issue he raised at the outset of trial and renewed shortly before the Commonwealth rested. Pritchett maintains that severance was necessary because his and Holley's defenses were mutually antagonistic, and because the evidence against Holley was substantially greater than that against Pritchett.

"Absent a constitutional requirement for severance, joinder and severance are matters committed to the sound discretion of the trial judge." Commonwealth v. McAfee, 430 Mass. 483, 485 (1999). A judge abuses his or her discretion in declining to sever a trial where the defenses are mutually antagonistic and

irreconcilable, meaning the "sole defense of each [is] the guilt of the other" (citation omitted), Commonwealth v. Vasquez, 462 Mass. 827, 837 (2012), or when "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial" (citation omitted). Commonwealth v. Hernandez, 473 Mass. 379, 391 (2015).

Neither of the defenses in this case rested solely upon the guilt of the other defendant. The primary focus of both defenses was the sufficiency of the evidence, as there were no witnesses to the shooting and no forensic evidence linking the defendants to the apartment where the victim was shot. See, e.g., Commonwealth v. Siny Van Tran, 460 Mass. 535, 543 (2011) (denial of motion to sever proper where defendants presented several defenses during trial, including inadequate police investigation). Both defendants also posited that a third party was responsible for the shooting, which they suggested was gang-related. See, e.g., Hernandez, 473 Mass. at 391-392 (2015) (defenses not mutually antagonistic where "the three codefendants all named other third parties as the actual perpetrators"). Pritchett argues that "each defendant could avail himself of the argument that the other committed the crime without his intentional participation," but that falls short of demonstrating that the sole defense of each defendant was the guilt of the other. See Hernandez, 473 at 391; Vasquez, 462

Mass. at 836 ("Severance is not mandated simply because defenses are hostile").

Nor has Pritchett demonstrated that joinder prevented him from obtaining a fair trial. Although the evidence showed that Holley had a stronger connection to the victim, there was sufficient evidence of Pritchett's participation in the crime, including his text messages with Holley in which he helped plan the armed robbery, as well as cell site data and video surveillance showing that he entered and fled the scene with Holley at the time of the shooting, and later manipulated the victim's iPhone. See Commonwealth v. Akara, 465 Mass. 245, 257 (2013) ("even mutually antagonistic and irreconcilable defenses do not require severance if there is sufficient other evidence of guilt" [citation omitted]); McAfee, 430 Mass. at 486 ("it is not enough that the defendants are hostile to one another or that one defendant would have a better chance of acquittal if tried alone"). The judge did not abuse his discretion in denying Pritchett's motion to sever.

f. Evidence of prior bad acts. Pritchett argues that a new trial is required because the judge allowed the admission in evidence of the uncharged gun theft from the house of the doctor's uncle. Pritchett contends that the probative value of this evidence was outweighed by the risk of unfair prejudice because his culpability in that theft was "tenuous at best and

speculative at worst," and because there was no evidence that either of the stolen firearms actually was used to shoot the victim.

"[E]vidence of a defendant's involvement in uncharged criminal activity 'may be admissible if relevant for some other purpose' than to show the defendant's bad character or propensity to commit the charged offense." Commonwealth v. Snyder, 475 Mass. 445, 456 (2016), quoting Commonwealth v. Corliss, 470 Mass. 443, 450 (2015). "One such purpose is 'to show that the defendant has the means to commit the crime.'" Corliss, supra, quoting Commonwealth v. Ridge, 455 Mass. 307, 311 (2009). "Even if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant." Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). A judge's decision to allow the admission of such evidence is "not disturbed absent palpable error." Commonwealth v. McGee, 467 Mass. 141, 156 (2014), quoting Commonwealth v. Spencer, 465 Mass. 32, 48 (2013).

Here, the evidence of the prior gun theft was relevant to show that Pritchett had the "means of committing the crime" (citation omitted). McGee, 467 Mass. at 156. Pritchett's text messages with the doctor's friend suggest that the two of them were trying to hide their involvement in the disappearance of

the handguns, as the friend told Pritchett, "just say you don't know anything like I did and well be cool." Additionally, on the morning of the shooting, just days after the theft of the handguns, Holley asked whether Pritchett had a "hand joint" and Pritchett responded that he had "a couple." These statements were made as part of a discussion of sawed-off rifles and revolvers, so the jury reasonably could have construed them as discussing handguns and could have concluded that the "couple" of handguns Pritchett mentioned came from the doctor's uncle.

That the Taurus was just one possible model of gun that "could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime" (citation omitted). McGee, 467 Mass. at 156. It was for the jury to decide whether the Taurus was the weapon used in the shooting.[24] Id. at 157. As for the Jennings handgun, which was excluded as a possible murder weapon, it was admissible to show

---

[24] The ballistics expert's conclusion that the Taurus was a possible weapon only after he broadened his search parameters goes to the weight of the evidence and not, as Pritchett argues, to its admissibility. In his initial report, the expert did not list the Taurus as one of the weapons that could have fired the fatal bullet. During his testimony, the expert explained that his report was not exhaustive and that he had used a conservative set of measurements to analyze the bullet fragments. If those measurements were expanded by five one-thousandths of an inch, which was an acceptable variation, the Taurus could have been the weapon used in the shooting.

"that the defendant had access to or knowledge of firearms."[25]
Id.

The judge did not abuse his discretion in finding that the probative value of this evidence was not outweighed by the risk of unfair prejudice to Pritchett. Notwithstanding his contentions, the evidence did not portray Pritchett as a "thug." The evidence left it to the jury to determine whether in fact Pritchett had taken the missing handguns, and whether the Taurus was used to shoot the victim. See McGee, 467 Mass. at 157 (judge did not abuse discretion in determining that probative value of evidence of defendant's friend holding possible murder weapon "outweighed the risk that jury might use it as improper character or propensity evidence"). Additionally, the evidence of the prior theft did not involve the same type of underlying crime -- armed robbery to obtain marijuana -- that resulted in the victim's death. Thus, the risk that the jury would conclude that Pritchett had a propensity to commit this particular crime

_____

[25] A limiting instruction is not required with regard to evidence of a gun that could have been used in the charged crime. See Commonwealth v. McGee, 467 Mass. 141, 157 (2014). With respect to the gun that was excluded as a possible murder weapon, on the other hand, "[o]ften a limiting instruction is required as to the proper use of such evidence to ensure that its probative value outweighs the danger of unfair prejudice." Id. at 158. Pritchett does not raise this issue, however, and we conclude that the lack of an instruction did not create a substantial likelihood of a miscarriage of justice because this evidence received "scant attention" at trial. Id.

was low.  Contrast Crayton, 470 Mass. at 251 (judge abused his discretion in admitting evidence of prior bad acts because "the danger [was] great that a jury would make the powerful natural [and forbidden] inference that the defendant's possession of pornographic drawings of children shows that he has an interest in child pornography, so he must have been the person viewing child pornography in the library").

g.  Instruction regarding statements of joint venturers. Pritchett argues that the judge erred in declining to instruct the jury that hearsay statements of joint venturers may be considered for their truth only if the jury first determine, on the basis of independent, nonhearsay evidence, that a joint venture existed.  Pritchett maintains that, without such an instruction, the jury should not have considered any hearsay statements contained in the text messages admitted at trial.[26]

"We recognize, as an exception to the hearsay rule, that a statement made by a coconspirator or joint venturer may be admitted for its truth against the other coconspirators or joint venturers."  Commonwealth v. Mattier, 474 Mass. 261, 276-277 (2016), citing Mass. G. Evid. § 801(d)(2)(E) (2016).  To admit such evidence, a court must find, by a preponderance of the evidence, the existence of a joint venture independent of the

---

[26] Pritchett does not specify which text messages required such an instruction.

statement being offered. Commonwealth v. Rakes, 478 Mass. 22, 37 (2017). See Mass. G. Evid., supra. Where the judge makes this preliminary determination, the statement of the joint venturer may be presented to the jury. Rakes, supra. Before considering the statement as bearing on the defendant's guilt, however, the jury must make "their own independent determination, again based on a preponderance of the evidence other than the statement itself, that a joint venture existed and that the statement was made in furtherance thereof." Id.

Insofar as the hearsay statements of the defendants were admitted against both of them, the judge should have made a preliminary finding regarding their admissibility and then, where warranted, instructed the jury that they could consider those statements only if they first found independent, nonhearsay evidence of a joint venture. Nevertheless, the judge's failure to do so does not constitute reversible error because it did not prejudice the defendants. See Commonwealth v. Szlachta, 463 Mass. 37, 45 (2012) (where defendant objects to judge's refusal to give requested instruction, "we review the judge's action to determine whether there was error and, if so, whether the error prejudiced the defendant").

The Commonwealth introduced overwhelming independent, nonhearsay evidence establishing the existence of a joint venture by, at the very least, a preponderance of the evidence.

This evidence included surveillance videos showing Holley and Pritchett entering and leaving the victim's apartment building together within a few minutes; entering the MBTA station using a single ticket and sitting next to each other on a bench, and then walking out of the station together; getting onto the bus and sitting next to each other; and interacting with each other during the ride.  The cell site location data further corroborated their locations, and was consistent with the images seen in the various surveillance videos.  See, e.g., Commonwealth v. Odware, 429 Mass. 231, 236-237 (1999) (judge's failure to give requested instruction "on the possibility that the witnesses made a good faith error in identifying [defendant]" was not prejudicial error due to "overwhelming evidence against the defendant").  Pritchett is not entitled to a new trial on this basis.

4.  Relief pursuant to G. L. c. 278, § 33E.  Having carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to set aside the verdicts or to reduce the degree of guilt.

Judgments affirmed.